# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE APPRAISAL OF COLUMBIA PIPELINE GROUP, INC. | ) ) | Cons. C.A. No. 12736-VCL |

## MEMORANDUM OPINION

Date Submitted: May 16, 2019
Date Decided: August 12, 2019

Stephen E. Jenkins, Andrew D. Cordo, Marie M. Degnan, ASHBY & GEDDES, P.A., Wilmington, Delaware; Marcus E. Montejo, Kevin H. Davenport, John G. Day, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Mark Lebovitch, Jeroen van Kwawegen, Christopher J. Orrico, Alla Zayenchik, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Attorneys for Petitioners*.

Martin S. Lessner, James M. Yoch, Jr., Paul J. Loughman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Brian J. Massengill, Michael A. Olsen, Linda X. Shi, MAYER BROWN LLP, Chicago, Illinois; *Attorneys for Respondent*.

**LASTER, V.C.**

The petitioners brought this statutory appraisal proceeding to determine the fair value of the common stock of Columbia Pipeline Group, Inc. The valuation's effective date is July 1, 2016, when TransCanada Corporation completed its acquisition of Columbia (the "Merger"). Pursuant to an agreement and plan of merger dated March 17, 2016 (the "Merger Agreement"), each share of Columbia common stock was converted into the right to receive $25.50 in cash, subject to each stockholder's right to eschew the consideration and seek appraisal. This post-trial decision finds that the fair value of Columbia's common stock on the effective date was $25.50 per share.

## I.      FACTUAL BACKGROUND

The evidentiary record is vast.[1] After an initial spat during the pre-trial process, the parties agreed to 716 stipulations of fact, which were a welcome contribution. During a five-day trial, the parties submitted 1,472 exhibits, including twenty-one deposition transcripts.[2] Nine fact witnesses and five experts testified live. The following factual

---

[1] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 397. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number or, if the document lacked a control or JX number, by the internal page number. If a trial exhibit used paragraph numbers, then references are by paragraph.

[2] The parties designated the transcripts as joint exhibits rather than lodging them separately. The JX designations made it more difficult to determine during briefing when a deposition transcript was being cited and whose testimony it was. It would be more helpful to have the deposition transcripts lodged and collected in a separate binder, then cited in the form "[Name] Dep." I offer this point not to criticize the parties' approach, which was a reasonable one, but rather as a suggestion for the future.

findings represent the court's effort to distill this record.

## A.    Columbia

At the time of the Merger, Columbia was a Delaware corporation whose common stock traded actively on the New York Stock Exchange under the ticker symbol "CPGX." Columbia developed, owned, and operated natural gas pipeline, storage, and other midstream assets. As a midstream company, Columbia did not own or sell the commodities that it transported or stored. Columbia's success depended on its contracts with shippers and producers.

Columbia's primary operating asset consisted of 15,000 miles of interstate gas pipelines running from New York to the Gulf of Mexico. The pipelines served the strategically important Marcellus and Utica natural gas basins in Pennsylvania, Ohio, and West Virginia. Columbia's growth-oriented business plan sought to exploit a production boom in the Marcellus and Utica basins by expanding its pipeline network and selling the additional capacity. *See* PTO ¶ 248. The plan required billions of dollars in capital expenditures, which in turn required large amounts of low-cost financing.

Columbia itself was a holding company. Its principal asset was an 84.3% interest in Columbia OpCo LP ("OpCo"), which owned Columbia's operating assets. Columbia's largest business divisions operated interstate pipelines. Smaller divisions operated gas-gathering and processing systems.

Columbia also owned a 100% general partner interest and a 46.5% limited partner interest in Columbia Pipeline Partners, L.P. ("CPPL"), a master limited partnership ("MLP") whose common units traded on the New York Stock Exchange. CPPL owned the

2

other 15.7% interest in OpCo.

Columbia's business plan depended upon using CPPL to raise equity financing for Columbia's growth projects. To raise capital using an MLP, a sponsor like Columbia sells assets to the MLP, receiving cash in return. Because the MLP is a pass-through entity, it can raise capital at a lower cost than the sponsor.[3] Columbia planned to use a variant of the typical method. Rather than having CPPL buy assets from Columbia, CPPL would buy newly issued interests in OpCo, which would use the proceeds to fund Columbia's growth plan.[4] Given the magnitude of Columbia's capital needs, analysts expected that CPPL could own over 60% of OpCo by 2020. *See, e.g.*, JX 258 at 13.

## B. NiSource

When the process leading to the Merger began, Columbia was not yet a public company. It was a subsidiary of NiSource Inc., a publicly traded utility company that today serves approximately four million customers in seven states.

In 2005, Robert Skaggs, Jr. became the CEO of NiSource. He also served as chairman of its board of directors. In 2013, Skaggs told the NiSource directors that he wanted to retire in a few years. *See* Taylor Dep. 93. For planning purposes, Skaggs's

---

[3] *See* Tom Miesner, *A Practical Guide to US Natural Gas Transmission Pipeline Economics*, 8 J. Pipeline Eng'g 111, 112 (2009); Matthew J. McCabe, Comment, *Master Limited Partnerships' Cost of Capital Conundrum*, 17 U. Pa. J. Bus. L. 319, 325 (2014).

[4] JX 258 at 2; *see* JX 886 at 34 ("[Columbia's] 'Drop Downs' are atypical in that the transaction is effected through [CPPL] acquiring incremental interests in OpCo . . . . [Columbia's] interest in OpCo is accordingly diluted down.").

financial advisor used a target retirement date of March 31, 2016, and cautioned that "the single greatest risk" to Skaggs's retirement plan was his "single company stock position in NiSource." JX 163.

Stephen Smith was NiSource's CFO. Smith, who was fifty-two years old in 2013, considered fifty-five to be the "magical age" to retire. Smith Dep. 97–98; *see* JX 199. He too targeted a retirement date in 2016.

Since 2008, Lazard Frères & Co. had been evaluating a spinoff of Columbia as part of its regular work for NiSource. *See* JX 98 at 7–9. Lazard believed that a spinoff could unlock major value for NiSource.[5] In January 2014, Lazard made a presentation to the NiSource board. Consistent with Lazard's advice, Skaggs and Smith pitched forming CPPL as part of the spinoff to provide a financing vehicle for Columbia. *See* JX 91. For much of 2014, the NiSource board weighed its options.

In summer 2014, *The Deal* reported that Dominion Resources Inc. was trying to buy NiSource. The article described Skaggs as "a willing seller" but only in an all-cash deal at a 20% premium. JX 142.

---

[5] *See id.* at 46 (Lazard anticipating stock-price improvement of up to $12 per share; observing that NiSource traded "at a premium valuation relative to its diversified utility peers, but at a discount to the blended consolidated multiple implied by MLP valuations for [Columbia]"); *see also* JX 231 at 2 (consulting firm remarking in January 2015 that despite "40% drop in gas price since 2014" and "pressure" on "[g]as basin economics," that "original [spinoff] rationale holds: Utilities and [Columbia] are separate businesses, the market is supportive of focused players, growth stories and risk profiles are different"). *See generally* Mir Dep. 55–73. As anticipated, separating NiSource, Columbia, and CPPL increased their total market capitalization by approximately $4 billion. *See* JX 404 at 6.

## C. The Spinoff

On September 28, 2014, NiSource announced that it would spin off Columbia as a separate public company. NiSource also announced the formation of CPPL as the "primary funding source" for Columbia's growth capital. JX 182 at 15. CPPL would go public in early 2015. Columbia would follow later that year.

Columbia's post-spinoff business plan contemplated "a potential capital investment opportunity of $12–15 billion over the next 10 years, positioning the company to provide enhanced earnings and dividend growth driven by its projected net investment growth." JX 174. The largest components were pipeline expansion and modernization. JX 182 at 14. If all went according to plan, then Columbia would triple in size. *See* PTO ¶ 291. The plan envisioned funding the growth by having CPPL issue equity over a sustained period.[6]

---

[6] *See* Mir Tr. 1197 ("[T]he business plan was dependent on being able to raise a lot of equity through the MLP, CPPL. The MLPs at the time were the de facto means of raising equity for pipeline and midstream projects."); JX 300 at 20 (Lazard warning that Columbia's "[f]inancing plan [was] highly dependent on CPPL's ability to issue equity at attractive terms over time"); JX 480 at 7 (Lazard identifying upside of "[s]trong access to capital and low cost of CPPL equity" and downside of "CPPL unable to access equity market at attractive terms (potentially requiring [Columbia] to issue equity)"); JX 214 at 17 (CPPL IPO pitch materials indicating CPPL's equity would "be the primary source of new funding for Columbia OpCo expansion capital projects"); JX 277 at 4 (analyst report identifying risks like "highly leveraged balance sheet," growth plan's execution risk, and "financing strategy which relies almost completely on [CPPL's] ability to access the equity capital markets during the next several years"); *see also* Kittrell Tr. 1052 ("As part of the spin, we had been able to launch [CPPL] in January of 2015 and raise just over a billion dollars. We also had done a series of debt financings as of the spin for about $3 billion. So that gave Columbia $4 billion of permanent capital to kind of come out of the chute with as a standalone independent company. That still left $3 to 4 billion of capital that we were going to need for '16, '17, and '18."); JX 96 at 12 (Lazard observing that the "most successful" MLPs had "low-risk assets and visible growth opportunities, driven by either

5

In December 2014, the NiSource board signed off on Skaggs and Smith leaving NiSource and joining Columbia. Skaggs would become CEO and chairman of the board for Columbia and CPPL; Smith would become CFO of both entities. Skaggs and Smith made the move partly because they did not "want to work forever." JX 208. By this time, two investment banks had told Smith that Columbia would "trade too rich to sell," and Smith sought a third view from Goldman Sachs & Co. *See id.* Goldman believed Skaggs and Smith were eyeing "a sale in near term." *Id.*

On February 11, 2015, CPPL closed its initial public offering, generating net proceeds of approximately $1.17 billion. Under Columbia's business plan, CPPL did not plan to raise additional equity until 2016. JX 304 at 28. In the meantime, Columbia planned to draw over $500 million from a revolving credit facility. *Id.*

As part of the spinoff, Columbia borrowed $2.75 billion through a private placement of debt securities. Columbia used the proceeds to make a $1.45 billion cash distribution to NiSource and to refinance its existing debt. *See id.* Moody's Investors Service rated Columbia's debt at Baa2, one notch above non-investment grade. PTO ¶ 262. Columbia's debt level meant that it could not borrow additional capital to fund its business plan and would have to rely on CPPL. *See* JX 466; JX 1339.

Columbia anticipated that it would become an acquisition target after the spinoff.

---

organic investments or dropdowns from a supportive general partner that is motivated to grow IDR distributions [to itself]").

As part of its pre-transaction planning, Columbia engaged Lazard as its financial advisor.[7] As of May 2015, Lazard categorized the potential acquirers into four tiers, ranked by their ability to pay and likelihood of interest. The first tier consisted of Kinder Morgan, Inc. and Energy Transfer Equity, L.P. The second tier included TransCanada, Berkshire Hathaway Energy, Dominion, Spectra Energy Corp., NextEra Energy, Enbridge Inc., and The Williams Companies. *See* JX 300 at 35; Mir Dep. 136–48.

On May 28, 2015, Lazard contacted TransCanada and mentioned that Columbia might be for sale after the spinoff. JX 311. A contemporaneous memorandum from Skaggs's financial advisor made the point directly: "[Skaggs] noted that [Columbia] could be purchased as early as Q3/Q4 of 2015. I think they are already working on getting themselves sold before they even split. This was the intention all along. [Skaggs] sees himself only staying on through July of 2016." JX 324.

In June 2015, Lazard advised TransCanada against "opening a dialogue" until after the spinoff. JX 335. Doing so could jeopardize the spinoff's tax-free status, which required that NiSource not spin off Columbia in anticipation of a sale. *See* JX 311. Internally, TransCanada discussed that "absent a knock out offer, [Columbia] will likely go for a market check (to maximize proceeds), which we should be prepared for." JX 335.

On July 1, 2015, NiSource completed the spinoff. On its first day of trading, Columbia's stock closed at $30.34 per share.

---

[7] JX 167; *see* Mir Tr. 1195–97. Pre-spinoff, the operative entity was Columbia Energy Group, but for simplicity this decision uses "Columbia."

From the spinoff until the Merger, Columbia's board of directors (the "Board") consisted of Skaggs and six outside directors. The lead independent director was Sigmund Cornelius, an oil and gas veteran who had worked in the pipeline industry and as the CFO of ConocoPhillips. The other directors were Marty Kittrell, Lee Nutter, Deborah Parker, Lester Silverman, and Teresa Taylor. Most had served as directors of NiSource before the spinoff.

## D.     Early Interest From Possible Buyers

On July 2, 2015, Columbia engaged Goldman to advise on any unsolicited acquisition proposals. JX 347. Over the next two weeks, Dominion and Spectra contacted Skaggs to discuss potential strategic transactions. *See* PTO ¶¶ 391–93. Skaggs viewed the Spectra outreach as trivial, but thought Dominion was worth exploring. *See* JX 359 (Skaggs classifying Spectra outreach as "casual pass" and Dominion as "notable/substantive").

On July 20, 2015, Dominion expressed interest in buying Columbia for $32.50 to $35.50 per share, half stock and half cash. Lazard's contemporaneous discounted cash flow ("DCF") analysis valued Columbia at $30.75 per share, 5% higher than the trading price. *See* PTO ¶ 395. After discussing the expression of interest with the Board and receiving advice from Lazard and Goldman, Skaggs asked Dominion to raise its price to the "upper-$30s." *See id.* ¶¶ 397–98.

On August 12, 2015, Columbia and Dominion entered into a non-disclosure agreement (an "NDA"). PTO ¶ 400; *see* JX 416. The parties began due diligence, but on August 31, Dominion disengaged. Citing a decline in Columbia's stock price amid general stock market volatility, Dominion indicated that even its floor of $32.50 per share had

8

become too high. *See* PTO ¶ 406.

By the end of August 2015, Columbia's stock price had fallen to around $25 per share. By late September, it had fallen to around $18 per share.

Meanwhile, TransCanada continued to examine Columbia as an acquisition target. *See* JX 458. TransCanada's Senior Vice President for Strategy and Corporate Development, François Poirier, was friends with Smith and asked him to dinner on October 26. *See* JX 487. It seems likely that other companies were studying Columbia as well, but it is unclear to what extent other firms were included in the scope of discovery. The petitioners issued subpoenas to Spectra, Berkshire, Dominion, and NextEra. *See* Dkts. 132, 170, 176, 217. They also obtained discovery from Goldman and Lazard.

## E.    The Equity Overhang

During fall 2015, the energy markets deteriorated, and the market for issuances of equity by MLPs was "effectively closed." JX 466; *see, e.g.*, Kittrell Tr. 1053–54 (citing "sea change" in MLP market that "has continued to this day"). The new market dynamics meant that Columbia could no longer use CPPL to raise equity. *See* JX 466. With $1 billion in short-term funding needs and no capacity to take on more debt, Columbia had to consider issuing equity itself, even though its cost of equity had spiked too.[8]

The confluence of problems created an "equity overhang." JX 466. If investors

---

[8] *See id. Compare* JX 753 at 4 (Skaggs explaining in January 2016 that "for CPPL to be a viable equity currency," prices would have to improve to at least $21 per unit by 2017 and at least $27 per unit by 2018), *with* Dkt. 390 Ex. D (stipulated CPPL price chart showing prices below $14 per unit in late 2015).

feared that Columbia could not obtain the capital to achieve anticipated growth rates, then they would bid down the stock. The lower price would force Columbia to issue more equity to raise the same amount of capital, and Columbia could become "mired in a vicious cycle of issuing more and more equity at lower and lower prices."[9]

In a memorandum to the Board dated October 16, 2015, Skaggs summarized Columbia's situation, identifying both problems and potential solutions:

- "[T]he latest intrinsic value studies (which assume that we're able to fully manage CPG's financing, project execution, and counter-party risks) would suggest that CPG's value has dropped roughly 30%."

- "*Required Equity Financing:* We've raised almost $4 billion of capital (CPPL equity and CPGX debt) – at a very attractive cost of capital – during the first half of '15 to launch CPG as a standalone company. *Recall*: because of our investment grade credit rating commitments, CPG cannot issue long-term debt until 2018. Consequently, to support CPG's committed growth program **AND** maintain our investment grade credit ratings, CPG or CPPL still must issue between *$3 billion* and *$4 billion* of equity (*i.e.*, +/- 65% of CPG's current equity market capitalization) over the next three years (*i.e.*, $1+ billion of equity per year)."

- "*Track 1 – 'Stay the Course'*. Prepare to issue *~$1.0+* **billion** (~15% of CPG) of CPGX equity at +/-$18/share by mid-January. . . . The current thinking is that we would need to execute the transaction prior to our YE earnings disclosure (2/15) – when we are set to announce yet another increase (~$500 million) in our annual Cap-Ex plan (*i.e.*, a near-term expansion of the equity overhang). **Downside:** if this approach doesn't alleviate the equity overhang (and rather than a positive reaction,

---

[9] *Id.*; *see id.* ("[I]f there is a real or perceived expectation of reduced growth rates, all the more pressure is placed on the value of CPG's currencies, thereby exacerbating the challenge."); Mir Tr. 1198–1202 (discussing equity overhang at Columbia and CPPL levels); JX 1351 ¶¶ 100–01 (respondent's expert opining that "disruption in the MLP market and [Columbia's] equity overhang could have forced [Columbia] into issuing increasingly large numbers of shares to raise equity as the market drove down the value of [Columbia] shares in expectation of repeated [Columbia] equity issuances" (citing Jonathan Berk & Peter DeMarzo, *Corporate Finance* 888 (4th ed. 2017))).

CPGX/CPPL languishes), we face the real threat of ongoing value erosion."

- "***Track 2 – 'Seek a Balance Sheet'***. Explore whether *Dominion* or a select group of blue chip strategic players (*e.g.*, *MidAmerican* ([Berkshire Hathaway Energy]), *Sempra*, *Enbridge*, *TransCanada*, and perhaps *Spectra*) would have a legitimate interest in CPG – at a price that's within CPG's intrinsic value range. . . . This approach would be an attempt to capture/optimize CPG's intrinsic value (*i.e.*, avoid selling 15% of CPGX at a deep discount); position shareholders to participate in the potential growth of the combined enterprise; fully fund our growth plan, and exert a measure of control over the fate of our employees and other key stakeholders. **Downside:** We believe there is no downside in 'soft' overtures to any or all of these potential counterparties. This approach shouldn't 'put us in play.'"

JX 466.

At a Board meeting held on October 19 and 20, 2015, Skaggs recommended a dual-track strategy in which Columbia would prepare for an equity offering while engaging in exploratory talks with potential strategic or financing partners. PTO ¶ 422. The Board agreed.

## F. Renewed Talks With Possible Buyers

On October 26, 2015, Skaggs renewed talks with Dominion. Skaggs offered exclusivity in return for a prompt offer of approximately $28 per share, but he expected Dominion to respond "in the 20–25% premium zip code ($24–$25)."[10] That night Smith met with Poirier, who said that TransCanada wanted to buy Columbia. PTO ¶ 426; JX 487.

On October 29, 2015, the Board decided to wait to hear from Dominion before responding to TransCanada. JX 1399 at 2. The Board determined that Columbia would have to sell substantial public equity unless it received a merger proposal for "around $28

---

[10] *Id.* ¶ 425; *see* Skaggs Tr. 862–63; Cornelius Tr. 1133–34; *see also* JX 493.

11

per share." PTO ¶ 428.

On November 2, 2015, Dominion indicated that it could not offer $28 per share. Dominion proposed either (i) an all-stock merger with Dominion and its partner NextEra at an undefined "modest premium" or (ii) a Dominion equity investment in certain Columbia subsidiaries or joint ventures. *See id.* ¶ 430. That day, Columbia's stock closed at $21.12. Goldman believed that at this point, Columbia was trading "very close to 'dcf' value, against a backdrop of having traded at a discount to dcf value." JX 505.

On November 7, 2015, Skaggs followed up with Dominion about the Dominion/NextEra structure. PTO ¶ 436. On November 9, Columbia and TransCanada entered into an NDA. *Id.* ¶ 437. Over the next week, Columbia entered into additional NDAs with Dominion, NextEra, and Berkshire Hathaway Energy, and the NDA counterparties began conducting due diligence.[11]

Each NDA contained a standstill provision that prohibited the counterparty from making any offer to buy Columbia securities without the Board's prior written invitation. Most of the standstills lasted eighteen months. Each contained a feature colloquially known as a "don't-ask-don't-waive" provision (a "DADW"), which prohibited the counterparty from "making a request to amend or waive" the standstill or the NDA's confidentiality

---

[11] *Id.* ¶¶ 442–49, 452–54. Goldman regarded Berkshire and TransCanada as the most likely buyers, followed by Dominion. *See, e.g.*, JX 499 ("We know D[ominion] is interested, but at a price."). Poirier expected an auction. *See* JX 528. He encouraged his colleagues to act quickly because Columbia had a "massive financing overhang" and was preparing to "prefund[] [its] 2016/17 capex with a $1bn equity issuance." *Id.*

restrictions. *E.g.*, JX 526 § 3.

Although due diligence was getting off the ground, Columbia management did not think they could delay an equity offering beyond early December 2015. And waiting until the last possible minute to raise equity exposed Columbia to risk. On November 17, 2015, the Board authorized management to proceed with the equity offering as early as the week of November 30. PTO ¶ 456.

On November 24, 2015, TransCanada expressed interest in an all-cash acquisition at $25 to $26 per share. Berkshire expressed interest in an all-cash acquisition at $23.50 per share. Both expressions of interest were conditioned on further diligence. Berkshire warned that an equity offering would "kill [its] conversation" with Columbia. *Id.* ¶ 477.

On November 25, 2015, the Board decided to terminate merger talks and proceed with the equity offering. Columbia sent letters to Dominion, NextEra, Berkshire, and TransCanada instructing them to destroy the confidential information they had received under their NDAs. NextEra was disappointed to lose the opportunity, but Dominion was happy to go elsewhere. Dominion had already reached out to Questar Corporation, and in February 2016, Dominion announced that it was buying Questar for $4.4 billion, effectively ending any prospect for a Columbia-Dominion merger. *See, e.g.*, PTO ¶ 478; JX 890.

Skaggs called TransCanada and Berkshire personally to reject their offers. TransCanada's CEO, Russell Girling, asked if Columbia would forego the equity offering if TransCanada "close[d] the gap between $26 and $28 and we get it done before Christmas." JX 588; *see also* JX 575 at 4. Skaggs said no. He explained that Columbia

could not risk a failed deal followed by a more expensive equity offering in 2016. *See* PTO ¶ 476; Skaggs Tr. 875–77; *see also* JX 594.

The same day, Smith told Poirier that Columbia "probably" would want to pick up merger talks "in a few months." JX 588; *accord* Poirier Tr. 384. Poirier believed that Columbia could have delayed its equity raise until January, but that Columbia went ahead to improve its bargaining position. Poirier also doubted whether Columbia's directors shared management's enthusiasm for a deal. JX 594.

## G. The Equity Offering

After the market closed on December 1, 2015, Columbia announced an equity offering at $17.50 per share. PTO ¶ 480. Columbia's stock had closed that day at $19.05. *Id.* ¶ 481. The below-market offering was oversubscribed and raised net proceeds of $1.4 billion. At trial, Skaggs described the offering as "an unmitigated disaster" because Columbia had "sold 25 percent of the company at 17.50." Skaggs Tr. 890. Columbia had solved its short-term funding needs, but the overhang would persist without a long-term solution. *See* JX 1060 at 6; Poirier Tr. 450; Skaggs Dep. 139.

After the equity offering, Skaggs met with Columbia's directors individually to pitch them on selling the company. He emphasized that the business plan involved a "significant amount of execution risk (both financial and operational)." JX 646.

In mid-December 2015, Poirier called Smith to reiterate TransCanada's interest in a deal. They scheduled a meeting for January. Smith Tr. 236–37. Smith involved Skaggs and Goldman, but no one told the Board that Smith was continuing talks with

TransCanada.[12] Internally, TransCanada believed that the equity offering had made a deal "more challenging from a valuation standpoint," but regarded Columbia as a "very strategic" target. Poirier Tr. 445; *accord* Marchand Tr. 482.

## H.     The Poirier Meeting

On January 5, 2016, Smith emailed Columbia's draft 2016 management projections to Poirier. JX 680. Goldman prepared talking points for Smith to use with Poirier, and Skaggs approved them. *See* JX 679 (talking points advising that TransCanada could "avoid an auction process" with a "preemptive" price because "every dollar matters a lot to our Board"); Smith Tr. 248. The talking points were tailored to respond to positions TransCanada had taken during negotiations in November 2015, including TransCanada's stance that it was "not inclined to participate in an auction process" because it would take "resources to get[] fully comfortable with the growth projects." JX 575 at 4; *see* JX 589; JX 590. TransCanada had signaled that it would pay extra for exclusivity, and internally it was describing its price strategy as "preemptive." *See* JX 575 at 4.

On January 7, 2016, Smith met with Poirier. Smith literally handed him the list of talking points. Smith Tr. 247–48. Smith stressed that TransCanada was unlikely to face competition from major strategic players, telling TransCanada in substance that Columbia

---

[12] *See* PTO ¶ 500; Smith Tr. 248; *see also* JX 646 (Goldman: "[TransCanada] indicated that they could be ~$28.00/share."); Poirier Dep. 148 ("The goal posts of 26 and 30 would translate to 24 and 28 post equity issuance.").

had "'eliminated' the competition."[13] By doing so, Smith contravened Goldman's advice from 2015 to the effect that "[c]ompetition (real or perceived) is the best way to drive bidders to their point of indifference." JX 505.

Poirier and Smith portrayed these unusual tactics as a good-faith effort to entice TransCanada to bid by assuring TransCanada that it would be worthwhile to engage in due diligence.[14] But TransCanada was going to bid anyway, as it had before. It seems intuitive that Smith's assurance about TransCanada not facing competition would have undermined Columbia's bargaining leverage. At the same time, it is not clear how much of an effect the disclosure had, because TransCanada already knew about the company-specific problems that its competitors faced. *See* Poirier Tr. 435–36 (referring to "other potential suitors being distracted" as "public knowledge").

Regardless, on January 25, 2016, Girling called Skaggs to express interest in an all-cash acquisition in the range of $25 to $28 per share, similar to what TransCanada had proposed in November 2018. PTO ¶ 516. That day, Columbia's stock closed at $17.25.

---

[13] *See* JX 736 at 11; *id.* (noting that Dominion ("capital, HSR"), Enbridge ("complex structure"), Energy Transfer Equity ("overextended"), and Kinder Morgan ("out of the market") were unlikely to be suitors for Columbia); Poirier Dep. 149–52.

[14] *See* Smith Tr. 343 ("It was to negotiate with him, to basically say . . . the market is in disarray. There are number of, you know, big players that are dealing with issues. This is your opportunity, you know, to step up to the plate and make an offer that will get the attention of the board."); Poirier Dep. 150–51 (framing Smith's approach as "encouragement to dedicate time and resources" by describing TransCanada's strong odds of success at the right price); Poirier Tr. 435 ("He was simply trying to encourage us to be aggressive, that there was an opportunity for us to acquire this company.").

## I.       TransCanada Obtains Exclusivity.

In the weeks leading up to Girling's indication of interest, Skaggs had held a second round of one-on-one meetings with the Columbia directors, "priming them for a TC bid." JX 1466; *see id.* (Goldman indicating that Skaggs was "getting questions from the Board 'would you take $26 per share' – he said every day it gets harder to say no"). Lazard had advised Columbia's management that "[w]hile your valuation has swung widely, the $25– 28 range is a sensible one given what we have concluded is your DCF value right now." JX 742.

On January 28 and 29, 2016, the Board met with senior management, Goldman, and Columbia's legal counsel from Sullivan & Cromwell LLP. TransCanada had indicated that it would not proceed unless granted exclusivity. The Columbia team considered whether to solicit alternative suitors like Dominion or Spectra. The Board determined that TransCanada's indicative range offered a significant premium that outweighed the costs of exclusivity. *See* PTO ¶ 519; Kittrell Tr. 1061–62 (citing Goldman and Lazard's recommendation); Taylor Tr. 1273–74 (citing high odds of closing and "great" premium).

On February 1, 2016, Columbia granted TransCanada exclusivity through March 2, 2016, which they later extended by six days (the "Exclusivity Agreement"). PTO ¶¶ 523, 551. In simplified terms, Columbia could not accept or facilitate an acquisition proposal from anyone but TransCanada, except that in response to a "bona fide written unsolicited Transaction Proposal that did not result from a breach of" the Exclusivity Agreement, Columbia could engage with another party upon notice to TransCanada. In long form, the Exclusivity Agreement provided that Columbia could not

17

(a) solicit, initiate, encourage or accept any proposals or offers from any third person, other than [TransCanada], (i) relating to any acquisition or purchase of all or any material portion of the assets of [Columbia] or any of its subsidiaries, (ii) to enter into any merger, consolidation, reorganization, recapitalization, share exchange or other business combination transaction with [Columbia] or any subsidiary of [Columbia], (iii) to enter into any other extraordinary business transaction involving or otherwise relating to [Columbia] or any subsidiary of [Columbia], or (iv) relating to any acquisition or purchase of all or any material portion of the capital stock of [Columbia] or any subsidiary of [Columbia] (any proposal or offer described in any of clauses (i) through (iv) being a "Transaction Proposal"), or

(b) participate in any discussions, conversations, negotiations or other communications regarding, furnish to any other person any information with respect to, or otherwise knowingly facilitate or encourage any effort or attempt by any other person to effect a Transaction Proposal;

provided that in response to a bona fide written unsolicited Transaction Proposal that did not result from a breach of this letter agreement (an "Unsolicited Proposal") [Columbia] may, after providing notice to [TransCanada] as required by this letter agreement,

(1) enter into or participate in any discussions, conversations, negotiations or other communications with the person making the Unsolicited Proposal regarding such Unsolicited Proposal,

(2) furnish to the person making the Unsolicited Proposal any information in furtherance of such Unsolicited Proposal (provided that to the extent such information has not been previously provided to [TransCanada], [Columbia] shall promptly provide such information to [TransCanada]) or

(3) approve, recommend, declare advisable or accept, or propose to approve, recommend, declare advisable or accept, or enter into an agreement with respect to, an Unsolicited Proposal or any subsequent Transaction Proposal made by such person as a result of the discussions, conversations and negotiations or other communications described in clause (1), if the Board of Directors of [Columbia] determines in good faith, after consultation with its outside legal counsel, that the failure to do so would reasonably be expected to be a breach of its fiduciary duties under applicable law.

JX 832 (formatting altered). The Exclusivity Agreement further provided that

[Columbia] immediately shall cease and cause to be terminated all existing

discussions, conversations, negotiations and other communications with all third persons conducted heretofore with respect to any of the foregoing. [Columbia] shall

> (x) notify [TransCanada] promptly (and in any event within 24 hours) if any Unsolicited Proposal, or any substantive inquiry or contact with any person with respect thereto, is made and

> (y) in any such notice to [TransCanada], indicate the material terms and conditions of such Unsolicited Proposal, inquiry or contact, in the case of clause (y), except to the extent the Board of Directors of [Columbia] determines in good faith, after consultation with its outside legal counsel, that providing such information would not be in the best interests of [Columbia] and its stockholders.

*Id.* (formatting altered).

## J.    TransCanada Conducts Due Diligence.

On February 4, 2016, Columbia sent TransCanada a draft of the Merger Agreement. By February 5, TransCanada had sixty-nine personnel accessing Columbia's data room. JX 784. A subset of the personnel comprised a clean team that received access to Columbia's customer contracts, enabling TransCanada to assess Columbia's counterparty risk by examining its customers' creditworthiness. *See* Poirier Tr. 401–03. The parties have referred to these important contracts as "precedent agreements."[15]

---

[15] Broadly speaking, precedent agreements address future customer needs and can help justify pipeline expansion to regulators. *E.g.*, Mayo Dep. 277 ("[Precedent agreements are] the agreements signed before the final contract."). Columbia's precedent agreements covered infrastructure construction and defined the quantities of natural gas to transport, transportation path, and terms of service. PTO ¶ 280. A party with access to the precedent agreements could discern whether a given Columbia customer "was an ExxonMobil" or "a single B grade producer" prone to default in a downturn. *See* Marchand Tr. 526; *see also* JX 815 (TransCanada due diligence memo finding credit terms relatively disappointing yet "normal for U.S. regulated natural gas pipeline projects"); JX 829 (analyst report stating

TransCanada had indicated that it would submit a bid by February 24, 2016, with the caveat that it needed backing from credit rating agencies. On February 19, the credit rating agencies warned TransCanada that acquiring Columbia could result in a downgrade. One said that TransCanada was "buying a BBB-mid asset and adding leverage." JX 827. The other "observed that the resulting leverage from the transaction would be high in a difficult market with heightened counterparty concerns." PTO ¶ 535. On February 24, Girling told Skaggs that TransCanada needed more time to develop a financing plan that allowed it to pay $25 to $28 per share without hurting its credit rating. *Id.* ¶ 544. Meanwhile, Columbia and TransCanada continued to exchange drafts of the Merger Agreement.

## K. Columbia Demands A Price.

On March 4, 2016, the Board directed management to demand a merger proposal from TransCanada. On March 5, TransCanada offered $24 per share, below the low end of the range it had cited to secure exclusivity. Smith told Poirier that he could not recommend $24 per share to the Board, but could recommend $26.50. *See* PTO ¶ 563. TransCanada came back at $25.25, which it characterized as its best and final offer. *Id.* When Skaggs called Girling to reject the offer, Girling said: "I guess that's it." JX 901. Skaggs told the Board that TransCanada was unlikely to reengage and that "[i]n the meantime, we have stopped all deal-work." *Id.* Poirier told Smith that TransCanada lacked room to move on

that Columbia "requires credit support for non-I grade customers equivalent to 12–24 months of demand charges").

20

price. PTO ¶ 566.

With merger talks on hold, TransCanada's management debated how to justify paying more. *Id.* ¶ 568; JX 912; *see* JX 907. Its CFO, Don Marchand, thought a deal "at $26 would be off-the-charts in terms of premium paid and the market reaction could be quite tepid." PTO ¶ 568. He believed the transaction was "priced close to perfection at the $25.25 offer level." *Id.* TransCanada's COO thought Columbia was "playing . . . poker to see where our barf price is." JX 911 at 3. Poirier suggested floating a number like $25.75 or $26, then asking Columbia for another month to find capital and sort out credit rating issues. JX 905 at 3. To fund the Merger, TransCanada ultimately would sell more than $7 billion in assets and raise over $3 billion through the largest subscription receipts offering in Canadian history. JX 939; JX 1008 at 8, 13–14.

On March 6, 2016, TransCanada's management conveyed that they could support a price above $25.25 per share if Columbia's management would support a price below $26.50. *See* PTO ¶ 569. After consulting with Skaggs and Cornelius, Smith asked Poirier to offer $26 per share. *Id.* ¶¶ 570–71. Poirier replied that TransCanada's board needed until March 9 to make a decision.

## L.    The *Wall Street Journal* Leaks The Merger Talks.

On March 8, 2016, Columbia learned that the *Wall Street Journal* was preparing a story about TransCanada being in advanced discussions to acquire Columbia. TransCanada's exclusivity expired that night. *Id.* ¶¶ 579–81.

On March 9, 2016, TransCanada made a revised offer at $26 per share, with 90% of the consideration in cash and 10% in TransCanada stock. The offer was subject to market

21

conditions and feedback from credit rating agencies and TransCanada's underwriters.

On March 10, 2016, the Board convened to discuss TransCanada's proposal.[16] Skaggs reminded the Board that TransCanada's exclusivity had expired. JX 1399 at 13. The Board discussed that the news story could lead to inbound offers. After the meeting, the *Wall Street Journal* broke the story.[17]

## M. Spectra Reaches Out.

After seeing the article, Spectra emailed Skaggs to propose merger talks.[18] On March 11, 2016, the Board decided to renew TransCanada's exclusivity through March 18, subject to further evaluation of Spectra. The Board also instructed management to waive the standstills with Berkshire, Dominion, and NextEra. *See* JX 1399 at 15; *see also* JX 950. The next day, management sent emails waiving the standstills. PTO ¶¶ 603–05.

---

[16] In internal emails exchanged on March 10, 2016, TransCanada's bankers discussed that "[t]he [Columbia] board is freaking out and told the management team to get a deal done with 'whatever it takes'.. Oddly, the [Columbia] team has relayed this info to [TransCanada]." JX 938. This exchange could suggest that there was a path for Columbia to extract additional merger consideration from TransCanada, but the petitioners have not briefed this document, and I take no position on it.

[17] *See* Ben Dummett et al., *Keystone Pipeline Operator TransCanada in Takeover Talks*, Wall St. J., March 10, 2016, https://www.wsj.com/articles/keystone-pipeline-operator-transcanada-in-takeover-talks-1457627686 ("TransCanada . . . is in takeover talks with Columbia Pipeline Group Inc., a U.S. natural-gas pipeline operator with a market value of about $9 billion. The companies could reach a deal in the coming weeks, according to people familiar with the matter.").

[18] JX 949. Goldman received calls too. *See* JX 951 at 3 ("One question [Skaggs] asked is shd [*sic*] we let [TransCanada] know we are getting calls."); *see also* JX 948 (Goldman banker indicating "[n]ot a lot of interest [from Columbia's management] in engaging with Spectra. Would be all-stock deal, they don't love Spectra's assets.").

On the morning of March 12, 2016, the Board determined that Spectra was unlikely to propose a deal superior to TransCanada's latest offer. *See* JX 1399 at 15–16. Around this time, everyone at Columbia acted as if TransCanada's exclusivity had already been renewed. The Board approved a script "to use with Spectra and other inbounds." JX 964. It stated: "We will not comment on market speculation or rumors. With respect to indications of interest in pursuing a transaction, we will not respond to anything other than serious written proposals." JX 1399 at 15–16.

Based on advice from Goldman and Sullivan & Cromwell, Skaggs proposed to send the script to TransCanada. He described this move as a way to reassure TransCanada that its deal remained on track, and to pressure TransCanada to agree to an "expedited" closing. *See* JX 964. After the Board met on March 12, Columbia's in-house counsel asked TransCanada to approve the script:

> [O]ur board has agreed to the renewal of the EA for one week subject to your agreement that this scripted response would not violate the terms of the EA (both in terms of the inbound received in the EA's gap period and going forward until signing, which unfortunately, given the leak, there is a potential that we will receive additional inquiries). Please confirm via response to this email that [TransCanada] is in agreement with this condition/interpretation and we will send over the new EA.

JX 968 at 2. Asking TransCanada whether the script violated the Exclusivity Agreement made no sense. Exclusivity had expired days before. Columbia's in-house counsel also conveyed to TransCanada that Columbia had received "an inbound from a credible, large, midstream player," without saying who it was. JX 973.

The Board had instructed Goldman to screen Spectra's calls so that Spectra could not talk directly with management. *See* JX 957; JX 1399 at 15–16. On March 12, Spectra's

23

CFO called Goldman, and Goldman read the script. *See* JX 974 (Spectra's CFO: "[The Goldman banker] said he had to read from a script that had two messages."). The Spectra CFO told Goldman that "any indication of interest would have to be conditioned on further due diligence." *Id.* Spectra said it could "move quickly" and "be more specific subject to diligence," but the script did not allow for that option. JX 970. As one Goldman banker put it: "Does [Spectra] 'get it' that they aren't going to get diligence without a written proposal?" *Id.* The inverted approach effectively shut out Spectra. TransCanada had not bid without due diligence, and no one else was going to either. *See, e.g.*, JX 1399 at 3 (discussing TransCanada's need for "30 to 45 days of due diligence in order to firm up the potential offer").

Later on March 12, Spectra's head of M&A made a follow-up call. He said to expect a written offer in the "next few days" absent a "major bust." JX 992. The banker who took the call found Spectra's assurance credible, but Skaggs and Smith were not interested.[19] The Board-approved script meant that Columbia could only entertain a "serious written proposal," which Smith defined as

---

[19] *See id.* (Smith email to Goldman and management: "We need to think about what the protocol is if we get a letter. Presumably, the Board would have to respond officially, we would have to notify [TransCanada] and we should think about what our response is if they make it public after being rebuked."); Skaggs Tr. 1021–22 ("Q. . . . During this stage when you were getting an inbound call from the CEO of Spectra, an inbound e-mail from the CEO of Spectra, a call from the CFO of Spectra to Goldman Sachs, and a call from the chief development officer of Goldman Sachs, did you, Mr. Skaggs, or another member of management, do anything to respond to Spectra? And since I'm going to anticipate what you're going to say, other than tell Goldman to look at the script. A. That was it, sir. Q. So the answer's no. A. No.").

a bona fide proposal that says I will pay you X for your company. Hard and fast. No outs. No anything. No way to wiggle out of anything. This is going to happen. You're going to pay whatever you're going to pay per share and we're going to sign that agreement and we're done. I don't know of any company that would do that in that short of a timeframe.

Smith Tr. 272. Spectra never made a written offer, and TransCanada never faced competition or a meaningful threat of competition from the anonymous yet "credible, large" industry player that Columbia's management had described. *See* Poirier Tr. 417–18.

### N. TransCanada Changes Its Offer.

On March 14, 2016, Columbia renewed TransCanada's exclusivity through March 18, making it retroactive to March 12. PTO ¶ 617; *see* JX 978. After the renewal, Skaggs learned that TransCanada was revising its offer. *See* JX 1005; JX 1006. Citing execution risk with the stock component, TransCanada reduced its offer from $26 per share to $25.50, all cash. PTO ¶ 618. TransCanada threatened that if Columbia did not accept its reduced offer, then TransCanada would "issue a press release within the next few days indicating its acquisition discussions had been terminated." *Id.* Exclusivity terminated automatically upon receipt of TransCanada's reduced offer. *See* JX 978.

At a telephonic meeting held the same day, the Board acknowledged that TransCanada was pushing Columbia to act before Spectra could make an offer.[20] The Board decided to proceed with TransCanada as long as the termination fee in the Merger

---

[20] *See* JX 1399 at 17 ("The Board . . . acknowledged that proceeding with TransCanada on the expedited timetable would mean that the Company would potentially be entering into the merger agreement without having the opportunity to consider [the] formal proposal from Spectra" that Goldman expected to arrive "in the next few days.").

Agreement did not exceed 3% of equity value. *See id.* On March 15, 2016, Columbia and TransCanada agreed to a termination fee of 3%.

## O.     The Board Approves The Merger Agreement.

On March 16 and 17, 2016, the Board convened to consider the Merger. Sullivan & Cromwell reviewed the Merger Agreement. Goldman and Lazard opined that the consideration was fair to Columbia's stockholders. Goldman presented a DCF analysis that valued Columbia's stock at $18.64–$23.50 per share. JX 1016 at 107. Lazard's DCF ranges valued the stock at $18.88–$24.38 per share on a sum-of-the-parts basis and at $20.00–$25.50 per share on a consolidated basis. *Id.* at 80; JX 1136 at 75–76. Other valuation methods generated higher and lower ranges.[21] The Board determined that there was a serious risk that TransCanada would withdraw its offer if Columbia delayed signing to buy time for Spectra. The Board also determined that Spectra was unlikely to make a competitive offer, if it made one at all.[22]

---

[21] *See, e.g.*, JX 1016 at 78–79, 107; JX 1136 at 66, 74–77.

[22] *See* PTO ¶ 625. The Board made a related determination that the renewed Exclusivity Agreement prohibited Columbia from soliciting an offer from Spectra or anyone else. *See id.* That was inaccurate. The renewed Exclusivity Agreement expired upon "written notification to [Columbia] that [TransCanada] has determined that it is no longer interested in pursuing a Potential Transaction on terms at least as favorable to the stockholders of [Columbia] as the terms discussed . . . on March 10, 2016." JX 978 at 4. TransCanada's March 10 proposal offered $26 per share. TransCanada's reduced offer of $25.50 per share terminated exclusivity. But if the Columbia directors had considered this fact, it would not have changed how they proceeded. When exclusivity terminated the first time, the Board acted as if it remained in place, and the script used with Spectra was the functional equivalent of exclusivity. *See* JX 968. The Board worried about losing the

At the conclusion of the meeting, the Board unanimously approved the Merger Agreement. Its terms provided for (i) a $309 million termination fee equal to 3% of the Merger's equity value, (ii) a no-shop provision, and (iii) a fiduciary out that the Board could exercise after giving TransCanada four days to match any superior proposal. JX 1025 §§ 4.02, 7.02(b).

**P.     Columbia's Stockholders Approve the Merger.**

Columbia held a special meeting of stockholders on June 22, 2016, to consider the Merger. Holders of 73.9% of the outstanding shares voted in favor of the Merger. Holders of 95.3% of the shares present in person or by proxy at the meeting voted in favor of the Merger. PTO ¶¶ 5–6. The Merger closed on July 1, 2016.

## II.     LEGAL ANALYSIS

"An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings." *Cede & Co. v. Technicolor, Inc.* (*Technicolor I*), 542 A.2d 1182, 1186 (Del. 1988). Section 262(h) of the Delaware General Corporation Law states that

> the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.

---

TransCanada offer, and it regarded that risk as outweighing the benefit of an expedited solicitation process involving other bidders.

8 *Del. C.* § 262(h). The statute thus places the obligation to determine the fair value of the shares squarely on the court. *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 361 (Del. 1997).

Because of the statutory mandate, the allocation of the burden of proof in an appraisal proceeding differs from a traditional liability proceeding. "In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions . . . ." *M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999). "No presumption, favorable or unfavorable, attaches to either side's valuation . . . ." *Pinson v. Campbell-Taggart, Inc.*, 1989 WL 17438, at *6 (Del. Ch. Feb. 28, 1989). "Each party also bears the burden of proving the constituent elements of its valuation position . . . , including the propriety of a particular method, modification, discount, or premium." Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, Corp. Prac. Series (BNA) No. 38-5th, at A-90 (2010 & 2017 Supp.) [hereinafter *Appraisal Rights*].

As in other civil cases, the standard of proof in an appraisal proceeding is a preponderance of the evidence. *M.G. Bancorp.*, 737 A.2d at 520. A party is not required to prove its valuation conclusion, the related valuation inputs, or its underlying factual contentions by clear and convincing evidence or to exacting certainty. *See Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009), *aff'd*, 2010 WL 376924 (Del. Jan. 14, 2010) (ORDER). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs., Inc. v.*

*Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (internal quotation marks omitted).

"In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own." *M.G. Bancorp.*, 737 A.2d at 525–26. "The Court may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation." *Appraisal Rights*, *supra*, at A-31 (collecting cases). The court also may "make its own independent valuation calculation by . . . adapting or blending the factual assumptions of the parties' experts." *M.G. Bancorp.*, 737 A.2d at 524. It is also "entirely proper for the Court of Chancery to adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." *Id.* at 526. "If neither party satisfies its burden, however, the court must then use its own independent judgment to determine fair value." *Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *5 (Del. Ch. Nov. 24, 2004).

In *Tri-Continental Corporation v. Battye*, 74 A.2d 71 (Del. 1950), the Delaware Supreme Court explained in detail the concept of value that the appraisal statute employs:

> The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, *viz.*, his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents the true or intrinsic value, . . . the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known

or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholder's interest, but must be considered . . . .[23]

Subsequent Delaware Supreme Court decisions have adhered consistently to this definition of value.[24] Most recently, the Delaware Supreme Court reiterated that "[f]air value is . . .

---

[23] *Id.* at 72. Although *Battye* is the seminal Delaware Supreme Court case on point, Chancellor Josiah Wolcott initially established the meaning of "value" under the appraisal statute in *Chicago Corporation v. Munds*, 172 A. 452 (Del. Ch. 1934). Citing the "material variance" between the Delaware appraisal statute, which used "value," and the comparable New Jersey statute that served as a model for the Delaware statute, which used "full market value," Chancellor Wolcott held that the plain language of the statute required "value" to be determined on a "going concern" basis. *Id.* at 453–55. *But see Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 355–56 (Del. Ch. 2004) ("This requirement that the valuation inquiry focus on valuing the entity as a going concern has sometimes been confused as a requirement of § 262's literal terms. It is not."). The going-concern standard also tracks the judicially endorsed account in which the appraisal statute arose "as a means to compensate shareholders of Delaware corporations for the loss of their common law right to prevent a merger or consolidation by refusal to consent to such transactions." *See, e.g.*, *Alabama By-Products Corp. v. Cede & Co.*, 657 A.2d 254, 258 (Del. 1995). As *Battye* explains, the appraisal statute calls for valuing the corporation as a going concern, using its operative reality as it then existed as a standalone entity, because that is the alternative that the dissenters wished to maintain. *Battye*, 74 A.2d at 72. Commentators have questioned the accuracy of the historical trade-off, but it remains part of the foundational understanding that has informed the concept of fair value. *See* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 130 n.52 (2005) ("The historical accuracy of this trade-off story is questionable, however, given the fact that the appraisal remedy was often added well after the adoption of statutes permitting mergers without unanimous consent." (citing Robert B. Thompson, *Exit, Liquidity, and Majority Rule: Appraisal's Role in Corporate Law*, 84 Geo L.J. 1, 14 (1995))).

[24] *See, e.g.*, *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 222 (Del. 2005); *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989); *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 141 (Del. 1980); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 218 (Del. 1975).

the value of the company to the stockholder as a going concern," *i.e.* the stockholder's "proportionate interest in a going concern." *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 132–33 (Del. 2019).

The trial court's "ultimate goal in an appraisal proceeding is to determine the 'fair or intrinsic value' of each share on the closing date of the merger." *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 20 (Del. 2017) (quoting *Cavalier Oil*, 564 A.2d at 1142–43). To accomplish this task, "the court should first envisage the entire pre-merger company as a 'going concern,' as a standalone entity, and assess its value as such." *Id.* (quoting *Cavalier Oil*, 564 A.2d at 1144). When doing so, the corporation "must be valued as a going concern based upon the 'operative reality' of the company as of the time of the merger," taking into account its particular market position in light of future prospects. *M.G. Bancorp.*, 737 A.2d at 525 (quoting *Cede & Co. v. Technicolor, Inc. (Technicolor IV)*, 684 A.2d 289, 298 (Del. 1996)); *accord Dell*, 177 A.3d at 20. The concept of the corporation's "operative reality" is important because "[t]he underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred." *Technicolor IV*, 684 A.2d at 298. Consequently, the trial court must assess "the value of the company . . . as a going concern, rather than its value to a third party as an acquisition." *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999).

"The time for determining the value of a dissenter's shares is the point just before the merger transaction 'on the date of the merger.'" *Appraisal Rights*, *supra*, at A-33 (quoting *Technicolor I*, 542 A.2d at 1187). Put differently, the valuation date is the date on

31

which the merger closes. *Technicolor IV*, 684 A.2d at 298; *accord M.G. Bancorp.*, 737 A.2d at 525. If the value of the corporation changes between the signing of the merger agreement and the closing, then the fair value determination must be measured by the "operative reality" of the corporation at the effective time of the merger. *See Technicolor IV*, 684 A.2d at 298.

The statutory obligation to make a single determination of a corporation's value introduces an impression of false precision into appraisal jurisprudence.

> [I]t is one of the conceits of our law that we purport to declare something as elusive as *the* fair value of an entity on a given date . . . . [V]aluation decisions are impossible to make with anything approaching complete confidence. Valuing an entity is a difficult intellectual exercise, especially when business and financial experts are able to organize data in support of wildly divergent valuations for the same entity. For a judge who is not an expert in corporate finance, one can do little more than try to detect gross distortions in the experts' opinions. This effort should, therefore, not be understood, as a matter of intellectual honesty, as resulting in *the* fair value of a corporation on a given date. The value of a corporation is not a point on a line, but a range of reasonable values, and the judge's task is to assign one particular value within this range as the most reasonable value in light of all the relevant evidence and based on considerations of fairness.[25]

Because the determination of fair value follows a litigated proceeding, the issues that the court considers and the outcome it reaches depend in large part on the arguments advanced

---

[25] *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003), *as revised* (July 9, 2004), *aff'd in part, rev'd in part on other grounds*, 884 A.2d 26 (Del. 2005); *accord Finkelstein v. Liberty Dig., Inc.*, 2005 WL 1074364, at *12 (Del. Ch. Apr. 25, 2005) ("The judges of this court are unremittingly mindful of the fact that a judicially selected determination of fair value is just that, a law-trained judge's estimate that bears little resemblance to a scientific measurement of a physical reality. Cloaking such estimates in grand terms like 'intrinsic value' does not obscure this hard truth from any informed commentator.").

and the evidence presented.

> An argument may carry the day in a particular case if counsel advance it skillfully and present persuasive evidence to support it. The same argument may not prevail in another case if the proponents fail to generate a similarly persuasive level of probative evidence or if the opponents respond effectively.

*Merion Capital L.P. v. Lender Processing Servs., L.P.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016). Likewise, the approach that an expert espouses may have met "the approval of this court on prior occasions," but may be rejected in a later case if not presented persuasively or if "the relevant professional community has mined additional data and pondered the reliability of past practice and come, by a healthy weight of reasoned opinion, to believe that a different practice should become the norm . . . ." *Global GT LP v. Golden Telecom, Inc.* (*Golden Telecom Trial*), 993 A.2d 497, 517 (Del. Ch.), *aff'd*, 11 A.3d 214 (Del. 2010).

In this case, the parties proposed three valuation indicators: (i) the deal price minus synergies, (ii) Columbia's unaffected trading price, and (iii) a DCF analysis. The petitioners relied on the DCF analysis. The respondent relied on the other two metrics. Although technically the respondent in an appraisal proceeding is the surviving company, the acquirer is typically the real party in interest on the respondent's side of the case. In this case, that party is TransCanada. Reflecting this reality, this decision refers to the respondent's arguments as TransCanada's.

A.      **Deal Price**

TransCanada contends that the deal price of $25.50 per share is a reliable indicator of fair value if adjusted downward to eliminate elements of value arising from the Merger.

33

The petitioners argue that the deal price should receive no weight, but that if it does receive weight, then it should be adjusted upward to reflect improvements in value that Columbia experienced between signing and closing. As the proponent of using the deal price, TransCanada bore the burden of establishing its persuasiveness. Each side bore the burden of proving its respective adjustments.

### 1. Guidance Regarding How To Approach The Deal Price

In three recent decisions, the Delaware Supreme Court has endorsed using the deal price in an arm's-length transaction as evidence of fair value.[26] In each decision, the Delaware Supreme Court weighed in on aspects of the sale process that made the deal price a reliable indicator of fair value, both by describing guiding principles and by applying them to the facts of the case. These important decisions illuminate what a trial court should consider when assessing the deal price as a valuation indicator.

#### a. *DFC*

The first decision—*DFC*—involved the acquisition of a payday lender (DFC Global) by a private equity firm (Lone Star). *In re Appraisal of DFC Glob. Corp.* (*DFC Trial*), 2016 WL 3753123, at *1 (Del. Ch. July 8, 2016) (subsequent history omitted). The respondent urged the court to rely on the deal price as the most reliable evidence of fair value. *Id.* To assess the deal price, the trial court examined the strength of the sale process,

---

[26] *See Aruba*, 210 A.3d at 135; *Dell*, 177 A.3d at 23; *DFC Glob. Corp. v. Muirfield Value P'rs*, 172 A.3d 346, 367 (Del. 2017).

explaining that the deal price "is reliable only when the market conditions leading to the transaction are conducive to achieving a fair price." *Id.*

The pre-signing sale process for DFC Global lasted two years, but proceeded in fits and starts. In April 2012, DFC Global hired a banker to explore a sale to a private equity firm. *Id.* at *3. The banker selected six firms, and a seventh expressed interest independently. By September 2012, none had bid, and the banker spent the next year reaching out to another thirty-five private equity firms and three potential strategic buyers.

In September 2013, two private equity firms—Crestview Partners and J.C. Flowers & Co.—expressed interest in a joint acquisition. In December 2013, Lone Star expressed interest in a transaction at $12.16 per share. After Crestview withdrew from the joint bid, J.C. Flowers expressed interest in a transaction at $13.50 per share.

During due diligence, DFC Global provided both bidders with a lowered set of projections, leading Lone Star to reduce its expression of interest to $11 per share. In March 2014, DFC Global entered into exclusive negotiations with Lone Star. During the exclusivity period, DFC Global provided an even lower forecast, and Lone Star dropped its formal bid to $9.50 per share. Lone Star gave DFC Global twenty-four hours to accept, but later extended the deadline by five days. DFC Global accepted, and the parties announced the transaction publicly on April 2, 2014. It closed on June 13, 2014. *Id.* at *4.

In the appraisal proceeding, the court first worked through the parties' DCF valuations and the respondent's comparable-companies analysis. Having done so, the court turned to the deal price, describing it as "an appropriate factor to consider" and observing that the company "was purchased by a third-party buyer in an arm's-length sale" after a

process that "lasted approximately two years and involved [DFC Global's] advisor reaching out to dozens of financial sponsors as well as several potential strategic buyers." *Id.* at *21. The court noted that the deal "did not involve the potential conflicts of interest inherent in a management buyout or negotiations to retain existing management . . . ." *Id.* Instead, Lone Star took the opposite approach and replaced most of the key executives. *Id.* At the same time, the court expressed concern that DFC Global was facing a period of regulatory uncertainty in which it could not access its full range of strategic options. The evidence also indicated that Lone Star had "focused its attention on achieving a certain internal rate of return and on reaching a deal within its financing constraints, rather than on [DFC Global's] fair value." *Id.* at *22. The trial court also observed that Lone Star had secured exclusivity during a critical phase of the sale process and pressured the company into the final price with an exploding offer. *Id.* at *23. The post-signing phase, by contrast, was relatively open, with a termination fee that "was reasonable and bifurcated to allow for a reduced fee in the event of a superior proposal." *Id.*

The trial court ultimately concluded that each of the three indicators that the parties advanced—the DCF analysis, the comparable-companies analysis, and the deal price—had limitations. But all three provided meaningful insight into DFC Global's value, and all three fell within a reasonable range. The court therefore averaged them, arriving at a valuation of $10.21 per share. *Id.* That outcome reflected a premium of 7.5% over the deal price of $9.50 per share.

On appeal, the Delaware Supreme Court reversed. In its first argument for reversal, the respondent contended that the Delaware Supreme Court should presume that the deal

36

price reflects fair value under specified conditions, effectively asking the Delaware Supreme Court to overrule its decision in *Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214 (Del. 2010). There, the high court had rejected a similar request to establish a presumption, explaining that "Section 262(h) neither dictates nor even contemplates that the Court of Chancery should consider the transactional market price of the underlying company. Rather, in determining 'fair value,' the statute instructs that the court 'shall take into account all relevant factors.'" *Id.* at 217 (quoting 8 *Del. C.* § 262(h)). The *Golden Telecom* decision observed that "[r]equiring the Court of Chancery to defer—conclusively or presumptively—to the merger price, even in the face of a pristine, unchallenged transactional process, would contravene the unambiguous language of the statute and the reasoned holdings of our precedent." *Id.* at 218.

In *DFC*, the Delaware Supreme Court again declined to establish a presumption, but cautioned that its

> refusal to craft a statutory presumption in favor of the deal price when certain conditions pertain does not in any way signal our ignorance to the economic reality that the sale value resulting from a robust market check will often be the most reliable evidence of fair value, and that second-guessing the value arrived upon by the collective views of many sophisticated parties with a real stake in the matter is hazardous.

*DFC*, 172 A.3d at 366. The justices also cautioned that "we have little quibble with the economic argument that the price of a merger that results from a robust market check, against the back drop of a rich information base and a welcoming environment for potential buyers, is probative of the company's fair value." *Id.*

The Delaware Supreme Court then elaborated on what fair value means when evaluating a deal price:

> [F]air value is just that, "fair." It does not mean the highest possible price that a company might have sold for had Warren Buffett negotiated for it on his best day and the Lenape who sold Manhattan on their worst. . . . Capitalism is rough and ready, and the purpose of an appraisal is not to make sure that the petitioners get the highest conceivable value that might have been procured had every domino fallen out of the company's way; rather, it is to make sure that they receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction.

*Id.* at 370–71.

Addressing the merits, the Delaware Supreme Court reversed the trial court's determination of fair value, noting that the trial court had made the following post-trial findings of fact:

> i) the transaction resulted from a robust market search that lasted approximately two years in which financial and strategic buyers had an open opportunity to buy without inhibition of deal protections;
>
> ii) the company was purchased by a third party in an arm's length sale; and
>
> iii) there was no hint of self-interest that compromised the market check.

*Id.* at 349 (formatting altered). The high court further observed that

> [a]lthough there is no presumption in favor of the deal price, under the conditions found by the Court of Chancery, economic principles suggest that the best evidence of fair value was the deal price, as it resulted from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit had a chance to bid.

*Id.*

38

The Delaware Supreme Court cited "the failure of other buyers to pursue the company when they had a free chance to do so" as one of several "objective factors that support the fairness of the price paid . . . ." *Id.* at 376. The high court also observed that Lone Star "was subjected to a competitive process of bidding[.]" *Id.* at 350. That finding was supported by the competition between Lone Star and J.C. Flowers before signing and the passive market check after signing. The Delaware Supreme Court also explained that "the fact that the ultimate buyer was alone at the end provides no basis for suspicion" given the trial court's findings that

i)      there was no conflict of interest;

ii)     [DFC Global's investment banker] had approached every logical buyer;

iii)    no one was willing to bid more in the months leading up to the transaction before management significantly adjusted downward its projections; and

iv)     management continued to miss its targets after Lone Star was the only buyer remaining.

*Id.* at 376 (formatting altered). The Delaware Supreme Court found that "the record does not include the sorts of flaws in the sale process that could lead one to reasonably suspect that the ultimate price paid by Lone Star was not reflective of DFC's fair value." *Id.*

Based on this analysis, the Delaware Supreme Court determined that the Court of Chancery's "decision to give one-third weight to each metric was unexplained and in tension with the Court of Chancery's own findings about the robustness of the market check." *Id.* at 388. The senior tribunal therefore remanded the case for the trial court to "reassess [its] conclusion as to fair value in light of our decision." *Id.* at 388–89.

### b.    *Dell*

The second decision—*Dell*—involved a management buyout of Dell Inc. in which its founder and CEO (Michael Dell) teamed up with a private equity firm (Silver Lake) to acquire the company. When the merger agreement was signed, the deal price was $13.65 per share. With the stockholder vote trending against the merger, the buyout group increased its bid to $13.75 per share (the "Final Merger Consideration").

The respondent contended that the Final Merger Consideration was the best evidence of Dell's fair value on the closing date. *In re Appraisal of Dell Inc.* (*Dell Trial*), 2016 WL 3186538, at *21 (Del. Ch. May 31, 2016) (subsequent history omitted). To analyze this contention, the trial court separately examined the pre- and post-signing phases of the transaction process.

The trial court found that bidding during the pre-signing phase had not produced fair value. Three factors contributed to this determination: (i) the bidders' use of leveraged-buyout models to price their bids, (ii) evidence that the stock market had undervalued Dell by focusing on its disappointing short-term prospects, and (iii) limited pre-signing competition. *See id.* at *29–37.

For present purposes, the third factor is most pertinent. The trial court determined that pre-signing competition was limited because Dell's special committee only invited one other private equity firm to compete with Silver Lake at any given time, and all of the firms priced the deal using the same leveraged-buyout financing model that Silver Lake had used. *See id.* at *9–10, *30–31, *37. The committee did not approach strategic buyers during the pre-signing phase, in part because one of the committee's financial advisors (Evercore)

40

discouraged the committee from contacting a wider universe of buyers until the go-shop process, when the advisor would earn a premium for generating a higher bid. *Id.* at *6, *11. The committee's other financial advisor (JPMorgan) expressed concern about the absence of a competitive dynamic and its effect on the bidding. *See id.* at *6, *37.

Having found that the pre-signing phase failed to support the reliability of the deal price, the trial court examined whether the post-signing phase validated it. The merger agreement contemplated a go-shop period, and during this phase, two financial sponsors emerged with competing recapitalizations. In response, and to secure a favorable stockholder vote, the buyout group increased its price to the Final Merger Consideration. *Id.* at *14, *16–18, *37–38. The trial court found that the results of the go-shop ruled out a large gap between the Final Merger Consideration and fair value, because if Dell's value had approached what the petitioners claimed, then a strategic bidder would have intervened. But the trial court also concluded that impediments to bidding undercut the reliability of the go-shop as a price-discovery tool, citing (i) the magnitude of the transaction, (ii) Mr. Dell's participation in the buyout group, including his financial incentives as a net buyer of shares and his valuable relationships with customers, and (iii) information asymmetries between the buyout group and competing bidders. *See id.* at *40–44.

Having concluded that the respondent did not carry its burden of proving the reliability of the deal price, the trial court relied on a DCF analysis. After resolving various disputes between the parties, the trial court made a fair-value determination of $17.62 per share, a result 28% over the deal price. This outcome appeared consistent with the result

41

from the sale process, because it exceeded what a financial sponsor would pay under a leveraged-buyout model, but was below the level where the valuation gap would be sufficiently attractive for a strategic buyer to intervene. It suggested that the company's best option was to remain independent and ride out what appeared to be a trough in the stock price. The trial court perceived that this dynamic permitted the buyout group to take the company private at a premium to market but at a discount to fair value. *See id.* at *51.

On appeal, the Delaware Supreme Court reversed. Consistent with its earlier decisions in *Golden Telecom* and *DFC*, the high court stressed that that "there is no requirement that the court assign some mathematical weight to the deal price . . . ." *Dell*, 177 A.3d at 23. But on the facts presented, the high court held that the trial court "erred in not assigning any mathematical weight to the deal price" under circumstances suggesting that "the deal price deserved heavy, if not dispositive weight." *Id.*; *accord id.* at 30 ("Overall, the weight of evidence shows that Dell's deal price has heavy, if not overriding, probative value.").

The Delaware Supreme Court explained that Dell's sale process featured "fair play, low barriers to entry, outreach to all logical buyers, and the chance for any topping bidder to have the support of Mr. Dell's own votes . . . ." *Id.* at 35. In reaching this conclusion, the Delaware Supreme Court viewed the pre-signing process favorably, noting that (i) the members of the special committee who ran the sale process were "independent, experienced . . . and armed with the power to say 'no,'" (ii) the committee persuaded the buyout group to raise its bid six times, from an initial range of $11.22-to-$12.16 to $13.65, and (iii) there was "[n]othing in the record [that] suggests that increased competition would

42

have produced a better result." *Id.* at 11, 28. The Delaware Supreme Court also cited "leaks that Dell was exploring strategic alternatives," which corroborated Evercore's assumption that "interested parties would have approached the Company before the go-shop if serious about pursuing a deal." *Id.* at 28. Finally, the high court cited JPMorgan's view that "any other financial sponsor would have bid in the same ballpark as Silver Lake." *Id.*

The Delaware Supreme Court also viewed the post-signing process favorably. The high court cited the number of parties that the committee's bankers contacted and the fact that the go-shop's structure was more flexible than other go-shops. *Id.* at 29. As with its assessment of the pre-signing phase, the Delaware Supreme Court stressed the absence of evidence that another party was interested in proceeding, explaining that "[f]air value entails at minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay." *Id.*; *see id.* at 32, 34. The absence of a higher bid meant "that the deal market was already robust and that a topping bid involved a serious risk of overpayment[,]" which in turn "suggests the price is already at a level that is fair." *Id.* at 33.

Although it reversed the trial court's finding of fair value, the Delaware Supreme Court did not require that the trial court adopt the deal price: "Despite the sound economic and policy reasons supporting the use of the deal price as the fair value award on remand, we will not give in to the temptation to dictate that result." *Id.* at 44. The high court left it to the trial judge to reach his own conclusion, while "giv[ing] the [trial judge] the discretion on remand to enter judgment at the deal price if he so chooses, with no further proceedings." *Id.*

### c.    *Aruba*

The third decision—*Aruba*—involved the acquisition of a technology company (Aruba Networks) by a much larger competitor (Hewlett-Packard). *See Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.* (*Aruba Trial*), 2018 WL 922139 (Del. Ch. Feb. 15, 2018) (subsequent history omitted). The respondent asked the court to give heavy weight to the deal price. To evaluate its reliability, the trial court examined the sale process in light of the Delaware Supreme Court's decisions in *Dell* and *DFC*.

The pre-signing sale process in Aruba had two phases. In late August 2014, HP approached Aruba about a deal. *Id.* at *7–8. Aruba hired an investment banker (Qatalyst), and the banker and Aruba management anticipated obtaining a deal for around $30 per share. *Id.* at *9. The companies entered into an NDA that restricted HP from speaking with Aruba management about post-transaction employment, and HP began conducting due diligence. After receiving projections from Aruba, HP determined that with synergies, the pro forma value of acquiring Aruba was as high as $32.05 per share. *Id.* at *11. Meanwhile, Qatalyst identified thirteen potential partners and approached five of them. For reasons having "nothing to do with price," none was interested. *Id.* at *10.

Despite the restriction in the NDA, HP asked Aruba's CEO, Dominic Orr, to take on a key role with the combined entity. Orr replied that he had no objection. *Id.* at *11. The parties seemed to be making progress towards a deal, but the HP board of directors balked at making a bid without further analysis, recalling the fallout from HP's disastrous acquisition of Autonomy Corporation PLC in 2011. By the end of November 2014, Orr felt

the process had dragged on long enough, and with the approval of the Aruba board, he terminated the discussions. *Id.* at *12.

For its part, HP continued to evaluate an acquisition of Aruba. In December 2014, HP tapped Barclays Capital Inc. as its financial advisor, a firm that had worked for Aruba and had been trying for months to secure the sell-side engagement. *Id.* at *13. On January 21, 2015, HP's CEO met Orr for dinner. During the meeting, when HP's CEO proposed resuming merger talks, Orr responded positively and suggested trying to announce a deal by early March. But HP's CEO also told Orr that because Qatalyst had represented Autonomy when HP acquired it, HP would not proceed if Aruba used Qatalyst. *Id.* at *14.

The Aruba board decided to move forward with the deal and informed Qatalyst about HP's ukase. Aruba was obligated to pay Qatalyst a fee in the event of a successful transaction, so it kept Qatalyst on as a behind-the-scenes advisor. From then on, Qatalyst's primary goal was to repair its relationship with HP, and Qatalyst regarded a successful sale of Aruba to HP as a key step in the right direction. Aruba also needed a new HP-facing banker. It hired Evercore, a firm that was trying to establish a presence in Silicon Valley. During the sale process, Evercore likewise sought to please HP, viewing HP as a major source of future business. *See id.* at *9, *15–16, *19, *21.

The ensuing negotiations proceeded quickly. HP had anticipated making an opening bid of $24 per share, but after Orr's enthusiastic response, HP opened at $23.25 per share. *Id.* at *16–17. Qatalyst reached out to a sixth potential strategic partner, but it was not interested. *Id.* at *17. The Aruba board decided to counter at $29 per share. Evercore conveyed the number to Barclays, but when Barclays dismissed it, Evercore emphasized

45

Aruba's desire to announce a deal quickly. *Id.* at *17–18. On February 10, 2015, twenty days after HP resumed discussions with Orr, the Aruba board agreed to a price of $24.67 per share. *Id.* at *19. The parties negotiated a merger agreement, and on March 1, 2015, the Aruba board approved it.

The post-signing phase was uneventful. On March 2, 2015, Aruba and HP announced the merger. The merger agreement (i) contained a no-shop clause subject to a fiduciary out, (ii) conditioned the out for an unsolicited superior proposal on compliance with an unlimited match right that gave HP five days to match the first superior proposal and two days to match any subsequent increase, and (iii) required Aruba to pay HP a termination fee of $90 million, representing 3% of the Aruba's equity value. No competing bidder emerged, and on May 1, 2015, Aruba's stockholders approved the merger. *Id.* at *21–22.

The trial court found that under *Dell* and *DFC*, Aruba's sale process was sufficiently reliable to make the deal price a persuasive indicator of fair value. The HP-Aruba transaction was an arm's-length merger. The ultimate decision-makers for Aruba—the board and the stockholders—did not face any conflicts of interest. During the sale process, Aruba extracted price increases from HP. There was also evidence that the deal price credited Aruba with a portion of the substantial synergies that the merger would create. And the merger agreement's deal protections were relatively customary and would not have supported a claim for breach of fiduciary duty. *Id.* at *36–38. The trial court therefore viewed the HP-Aruba merger as "a run-of-the-mill, third party-deal," where "[n]othing about it appears exploitive." *Id.* at *38.

46

The trial court next turned to the petitioners' specific challenges to the deal price. The petitioners argued that deal price resulted from a closed-off sale process in which HP had not faced a meaningful threat of competition. *Id.* at \*39. The trial court rejected that contention, noting that the petitioners failed "to point to a likely bidder and make a persuasive showing that increased competition would have led to a better result." *Id.* (citing *Dell*, 177 A.3d at 28–29, 32, 34). The petitioners proved that HP knew that it did not face a meaningful threat of competition, but they did not show that anyone else would have paid more. *Id.* at \*41. Instead, the record showed that none of the six parties that Qatalyst contacted was willing to bid, and no one emerged between signing and closing. *Id.*

The petitioners next argued that the negotiators' incentives undermined the sale process, citing the desire of Aruba's bankers to cater to HP and the more subtly divergent interests of Aruba's CEO. The trial court found that although the petitioners proved that Aruba could have negotiated more aggressively, they did not prove that "the bankers, [the CEO], the Aruba Board, and the stockholders who approved the transaction all accepted a deal price that left a portion of Aruba's fundamental value on the table." *Id.* at \*44.

In other portions of the decision, the trial court found that Aruba's unaffected trading price was a reliable indicator of fair value and rejected the parties' DCF valuations as unreliable. These holdings left the trial court with two reliable valuation indicators: the unaffected trading price and the deal price. The trial court determined that the unaffected trading price was the better measure of the fair value of Aruba's shares. *See id.* at \*53–55.

On appeal, the Delaware Supreme Court reversed. The high court found that the trial court had incorrectly relied on the unaffected trading price, but it accepted the trial

court's finding that the deal price was a reliable indicator of fair value. *Aruba*, 210 A.3d at 141–42.

Addressing the petitioners' claim that the sale process lacked a competitive bidding dynamic, the Delaware Supreme Court explained that the trial court had misinterpreted *DFC* and *Dell* as downplaying the value of competition. *See id.* at 136. The Delaware Supreme Court emphasized that

> when there is an open opportunity for many buyers to buy and only a few bid (or even just one bids), that does not necessarily mean that there is a failure of competition; it may just mean that the target's value is not sufficiently enticing to buyers to engender a bidding war above the winning price.

*Id.* The high court then applied this principle to the facts in *Aruba*:

> Aruba approached other logical strategic buyers prior to signing the deal with HP, and none of those potential buyers were interested. Then, after signing and the announcement of the deal, still no other buyer emerged even though the merger agreement allowed for superior bids. It cannot be that an open chance for buyers to bid signals a market failure simply because buyers do not believe the asset on sale is sufficiently valuable for them to engage in a bidding contest against each other. If that were the jurisprudential conclusion, then the judiciary would itself infuse assets with extra value by virtue of the fact that no actual market participants saw enough value to pay a higher price. That sort of alchemy has no rational basis in economics.

*Id.* On the facts presented, the level of competition in *Aruba* was sufficient to support the reliability of the deal price.

The Delaware Supreme Court also explained that

> a buyer in possession of material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller when agreeing to buy the company at a particular deal price, and that view of value should be given considerable weight by the Court of Chancery absent deficiencies in the deal process.

*Id.* at 137. The high court observed that HP and Aruba went "back and forth over price" and that HP had "access to nonpublic information to supplement its consideration of the public information available to stock market buyers . . . ." *Id.* at 139. The Delaware Supreme Court elsewhere emphasized that "HP had signed a confidentiality agreement, done exclusive due diligence, gotten access to material nonpublic information," and "had a much sharper incentive to engage in price discovery than an ordinary trader because it was seeking to acquire all shares." *Id.* at 140. On the facts presented, the extent of the negotiations in *Aruba* was sufficient to support the reliability of the deal price.

The high court ultimately concluded that Aruba's sale process was sufficiently reliable to render the deal price the best measure of fair value. The Delaware Supreme Court declined to use the trial court's estimate of the deal price minus synergies, instead adopting HP's contemporaneous synergies estimate and remanding with instructions that "final judgment be entered for the petitioners in the amount of $19.10 per share plus any interest to which the petitioners are entitled." *Id.* at 142.

### 2. Applying The Delaware Supreme Court's Precedents To This Case

The Delaware Supreme Court's precedents indicate that the sale process in this case was sufficiently reliable to make the deal price a persuasive indicator of fair value. These authorities call for rejecting the petitioners' challenges to the sale process.

#### a. Objective Indicia Of Deal-Price Fairness

When assessing whether a sale process results in fair value, it is critical to recall that "fair value is just that, 'fair.'" *DFC*, 172 A.3d at 370. "[T]he key inquiry is whether the dissenters got fair value and were not exploited." *Dell*, 177 A.3d at 33. "The issue in an

49

appraisal is not whether a negotiator has extracted the highest possible bid." *Id.* Rather, "the purpose of an appraisal is . . . to make that [the petitioners] receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction." *DFC*, 172 A.3d at 370–71.

When applying this standard, the Delaware Supreme Court has cited "objective indicia" that "suggest[] that the deal price was a fair price." *Dell*, 177 A.3d at 28; *accord DFC*, 172 A.3d at 376. In each of its recent decisions, the Delaware Supreme Court found that the objective indicia outweighed the sale processes' shortcomings. In this case, a similar analysis shows that the deal price is a reliable indicator of fair value.

First, the Merger was an arm's-length transaction with a third party. *See DFC*, 172 A.3d at 349 (citing fact that "the company was purchased by a third party in an arm's length sale" as factor supporting fairness of deal price). TransCanada was a pure outsider with no prior stock ownership in Columbia.

Second, the Board did not labor under any conflicts of interest. Six of the Board's seven members were experienced outside directors. *Cf. Dell*, 177 A.3d at 28 (citing fact that special committee was "composed of independent, experienced directors and armed with the power to say 'no'" as factor supporting fairness of deal price). Columbia's stockholders were widely dispersed, and the petitioners have not identified divergent interests among them.

Third, TransCanada conducted due diligence and received confidential insights about Columbia's value.[27] Like the acquirer in *Aruba*, TransCanada "had signed a confidentiality agreement, done exclusive due diligence, gotten access to material nonpublic information," and had a "sharp[] incentive to engage in price discovery . . . because it was seeking to acquire all shares." *Aruba*, 210 A.3d at 140.

Fourth, during the first pre-signing phase, Columbia contacted other potential buyers, and those parties failed to pursue a merger when they had a free chance to do so. *See DFC*, 172 A.3d at 376 (citing "failure of other buyers to pursue the company when they had a free chance to do so" as factor supporting fairness of deal price). The degree of pre-signing interaction is similar to or compares favorably with the facts in the Delaware Supreme Court precedents.[28]

---

[27] *See Aruba*, 210 A.3d at 137 (emphasizing that buyer armed with "material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller"). *But see In re Dunkin' Donuts S'holders Litig.*, 1990 WL 189120, at *9 (Del. Ch. Nov. 27, 1990) ("A bidder's objective is to identify an underpriced corporation and . . . acquire it at the lowest price possible."); *cf. DFC*, 172 A.3d at 374 n.145 (rejecting reliance on evidence indicating buyer's contemporaneous belief that it purchased target "at trough pricing"; commenting that "it is in tension with the statute itself to argue that the subjective view of post-merger value of the acquirer can be used to value the respondent company in an appraisal"; observing "[t]hat a buyer views itself as having struck a good deal is far from reliable evidence that the resulting price from a competitive bidding process is an unreliable indicator of fair value").

[28] *See Aruba*, 210 A.3d at 136–39, 142 (adopting deal price less synergies as fair value where company's banker contacted six potential buyers after HP's initial outreach, none were interested, sale process terminated, and sale process later resumed as single-bidder engagement with HP); *Dell*, 177 A.3d at 28 (finding competitive pre-signing process where Silver Lake competed one-at-a-time with interested parties); *DFC*, 172 A.3d at 350, 376 (finding "competitive process of bidding" where company's banker contacted "every

51

Fifth, Columbia negotiated with TransCanada and extracted multiple price increases. *See Aruba*, 210 A.3d at 139 (citing "back and forth over price"); *Dell*, 177 A.3d at 28 (citing fact that special committee "persuaded Silver Lake to raise its bid six times"). After TransCanada offered $24 per share, Columbia said no. When TransCanada raised its offer to $25.25, Columbia again said no. The deal price of $25.50 per share was more than any other party had ever seriously offered, including before the equity offering when Columbia sold 25% of its stock for less than its trading price.

Finally, no bidders emerged during the post-signing phase, which is a factor that the Delaware Supreme Court has stressed when evaluating a sale process.[29] The suite of deal protections in the Merger Agreement fell within the norm, making the absence of a topping bid significant.

Considering these factors as a whole, the sale process that led to the Merger bore objective indicia of fairness that rendered the deal price a reliable indicator of fair value.

---

logical buyer," three expressed interest, and two named a preliminary price with one dropping out before serious negotiations commenced).

[29] *See Aruba*, 210 A.3d at 136 ("It cannot be that an open chance for buyers to bid signals a market failure simply because buyers do not believe the asset on sale is sufficiently valuable for them to engage in a bidding contest against each other."); *Dell*, 177 A.3d at 29 ("Fair value entails at a minimum a price some buyer is willing to pay— not a price at which no class of buyers in the market would pay."); *id.* at 33 (finding that absence of higher bid meant "that the deal market was already robust and that a topping bid involved serious risk of overpayment," which "suggests the price is already at a level that is fair").

### b. Management Conflicts

As their central theme in this case, the petitioners argue that Skaggs and Smith engineered a fire sale of Columbia to obtain personal benefits.[30] They cite evidence that both had targeted a 2016 retirement date. *E.g.*, JX 163; JX 251. Each had a change-in-control agreement that paid out triple the sum of his base salary and target annual bonus if he retired after a sale of Columbia. If the sale occurred after July 1, 2018, then the multiple would drop from triple to double. PTO ¶¶ 206, 217; Taylor Tr. 1263. When Columbia separated from NiSource, both joined Columbia knowing that it was likely to be an acquisition target. According to the petitioners, the executives then strived to engineer a near-term sale, knowing they would come out ahead even in a sale at less than fair value.

The *Aruba* decision involved a sale process where the top executive and the company's investment bankers had conflicting incentives. The CEO wanted to retire, but he cared deeply about the company and its employees. When HP proposed to acquire Aruba and keep the CEO on to integrate the companies, it offered the perfect path "to an honorable personal and professional exit." *Aruba Trial*, 2018 WL 922139, at *5; *see id.* at *43 (analyzing CEO's conflict). Aruba's investment bankers faced more direct conflicts because both wanted to curry favor with HP. Qatalyst was desperate to save its Silicon

---

[30] At times, the petitioners also targeted a third executive—Glen Kettering—who served as President of Columbia. He was less involved in the sale process than Skaggs and Smith, and the petitioners never deposed him. Although Kettering retired after the Merger and received change-in-control benefits, the evidence does not support the contention that he pushed for an early sale.

Valley franchise, and Evercore was auditioning for future business. *Id.* at *43. The trial court acknowledged the petitioners' concerns, but found that the conflicting incentives did not undermine the deal price as an indicator of fair value:

> The evidence does not convince me that the bankers, Orr, the Aruba Board, and the stockholders who approved the transaction all accepted a deal price that left a portion of Aruba's fundamental value on the table. Perhaps different negotiators could have extracted a greater share of the synergies from HP in the form of a higher deal price. Maybe if Orr had been less eager, or if Qatalyst had not been relegated to the back room, then HP would have opened at $24 per share. Perhaps with a brash Qatalyst banker leading the negotiations, unhampered by the Autonomy incident, Aruba might have negotiated more effectively and gotten HP above $25 per share. An outcome along these lines would have resulted in HP sharing a greater portion of the anticipated synergies with Aruba's stockholders. It would not have changed Aruba's standalone value. Hence, it would not have affected Aruba's fair value for purposes of an appraisal.

*Id.* at *44. On appeal, the Delaware Supreme Court accepted the reliability of the deal price as a valuation indicator and used it when making its own fair value determination. *Aruba*, 210 A.3d at 141–42.

The *Dell* decision also involved a conflict: Mr. Dell, the company's founder and top executive, was a buy-side participant in the management buyout and would emerge from the transaction with a controlling stake. He did not lead the negotiations on the sell side (that task fell to the special committee), but the trial court regarded his involvement as a factor cutting against the reliability of the deal price. For example, the trial court found that Mr. Dell gave the buyout group a leg-up given his relationships within the company and his knowledge of its business, and the trial court accepted the testimony of a sale-process expert that if bidders competed to pay more than what Mr. Dell's group would pay, then

they risked a winner's curse. *Dell Trial*, 2016 WL 3186538, at \*42–43. Mr. Dell also was a net purchaser of shares in the buyout, so any increase in the deal price cost him money.

> If Mr. Dell kept the size of his investment constant as the deal value increased, then Silver Lake would have to pay more and would demand a greater ownership stake in the post-transaction entity. Subramanian showed that if Mr. Dell wanted to maintain 75% ownership of the post-transaction entity, then he would have to contribute an additional $250 million for each $1 increase in the deal price. If Mr. Dell did not contribute any additional equity and relied on Silver Lake to fund the increase, then he would lose control of the post-transaction entity at a deal price above $15.73 per share. Because Mr. Dell was a net buyer, any party considering an overbid would understand that a higher price would not be well received by the most important person at the Company.

*Id.* at \*43 (footnote omitted). These factors did not make Mr. Dell's involvement with the buyout group preclusive, as that term is used in an enhanced scrutiny case, because Mr. Dell testified credibly that he was willing to work with any bidder, and there was evidence that two of the buyout group's competitors had questioned Mr. Dell's value. But for purposes of price discovery in an appraisal case, the trial court perceived that Mr. Dell's involvement and incentives undermined the effectiveness of the sale process and the reliability of the deal price. *Id.* at \*44.

On appeal, the Delaware Supreme Court held that Mr. Dell's involvement in the buyout group had not undermined the sale process. *See Dell*, 177 A.3d at 32–33. The high court noted that "the [trial court] did not identify any possible bidders that were actually deterred because of Mr. Dell's status." *Id.* at 34. The Delaware Supreme Court also emphasized Mr. Dell's willingness to work with rival bidders during due diligence and the absence of evidence that Mr. Dell would have left the company if a rival bidder prevailed. *Id.* at 32–34. The high court concluded that the lack of a higher bid did not call into question

the sale process, because "[i]f a deal price is at a level where the next upward move by a topping bidder has a material risk of being a self-destructive curse, that suggests the price is already at a level that is fair." *Id.* at 33.

In this case, management's divergent interests fell short of the conflicts that failed to undermine the sale process in *Dell*. The alignment issue confronting Skaggs and Smith more closely resembled the negotiators' incentives in *Aruba*. Like Aruba's CEO and its bankers, Skaggs and Smith had personal reasons to secure a deal under circumstances where disinterested participants might have preferred a standalone option: Their change-in-control benefits incentivized them to favor selling Columbia before 2018. To minimize the risk of missing that window, it was safer to act sooner rather than later. *See In re Rural Metro Corp.*, 88 A.3d 54, 94–95 (Del. Ch. 2014) (discussing how incentives of contingently compensated representative are generally aligned with principal's but diverge over whether to do a deal at all), *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

But Skaggs and Smith also had countervailing incentives to pursue the best deal possible. Their change-in-control benefits included significant equity components that appreciated with a higher deal price. After the Merger, Skaggs retired and received change-in-control payments totaling $26.8 million, with over $19 million from equity awards. Skaggs received an additional $30 million when the Merger cashed out his nearly 1.2 million shares and phantom shares of Columbia stock. Smith similarly retired and received change-in-control payments totaling $10.9 million, with over $7.3 million from equity awards. PTO ¶¶ 654, 656; JX 1370 at 17–18; *see* JX 1346 ¶¶ 12, 27.

56

> When directors or their affiliates own "material" amounts of common stock, it aligns their interests with other stockholders by giving them a "motivation to seek the highest price" and the "personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so."

*Chen v. Howard-Anderson*, 87 A.3d 648, 670–71 (Del. Ch. 2014) (quoting *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 600 (Del. Ch. 2010)); *see also Lender Processing*, 2016 WL 7324170, at *22 (discussing incentive to maximize deal price where target managers were net sellers and would not retain jobs post-merger). That said, the equity components in the change-in-control benefits did not fully solve the alignment problem, because their contingent nature made their recipients more averse to losing a deal, thereby limiting their incentive to push for the final nickel or quarter. *See Rural Metro*, 88 A.3d at 94–95 (discussing how incentives of contingently compensated representative and principal diverge during final negotiations).

In sum, there is evidence to support the petitioners' theory, and I have considered it seriously. Ultimately, however, I cannot credit it. Although Skaggs and Smith wanted to retire, they were professionals who took pride in their jobs and wanted to do the right thing. They were not going to arrange a fire sale for below Columbia's standalone value, and the Board would not have let them.

Consistent with their incentives and professional responsibilities, Skaggs and Smith rejected opportunities for a quick sale. When Dominion expressed interest at an all-time high valuation, Skaggs demanded more. Instead of taking what they could get from Berkshire or TransCanada in fall 2015, Skaggs and Smith recommended a dilutive equity raise. JX 534; JX 1399 at 2–3. When Columbia told TransCanada that it was pursuing the

57

equity raise, Girling offered a prompt deal at a higher price. JX 588. Skaggs thought that was too risky for Columbia and declined. A Columbia director recognized that by pursuing the equity raise, Skaggs and Smith had opted for "BIG, at least near, financial hits to your net worth." JX 621.

When negotiations with TransCanada resumed, Skaggs remained focused on obtaining a fair price. While awaiting TransCanada's formal offer in February 2016, Skaggs told Cornelius that "if the cash portion of the initial salvo [is] below $25, I would be inclined to not even counter." JX 855. When TransCanada offered $24, Skaggs and Smith said it was a nonstarter. *See* PTO ¶ 563. TransCanada came back at $25.25, and Skaggs recommended that the Board reject it. JX 1399 at 10; Skaggs Tr. 908–10; *see* Cornelius Tr. 1142–43. The Board agreed, and after Skaggs told Girling, Lazard and Skaggs believed the deal had died and that Columbia would be proceeding with its standalone plan. *See* JX 901; JX 906; JX 913.

The most troubling event in the deal timeline is Smith's one-on-one meeting with Poirier, when he explained that TransCanada lacked competition. But Columbia did not take TransCanada's $24 per share offer, or even its $25.25 offer. Skaggs and the Board held out for a higher price, ultimately obtaining the Merger consideration of $25.50.

There is some evidence that if the Board had said no to $25.50 per share, then TransCanada would have looked for ways to go back up to $26. *See* Poirier Tr. 420–21. That prospect is insufficient to undermine the deal price for appraisal purposes. *See Dell*, 177 A.3d at 33 (explaining that fair value in an appraisal is not a measure of "whether a negotiator has extracted the highest possible bid"); *accord DFC*, 172 A.3d at 370.

58

The evidence does not convince me that the Skaggs, Smith, and the Board accepted a deal price that left a portion of Columbia's fundamental value on the table. As in *Aruba*, perhaps different negotiators could have done better. If they had, then the higher price would have resulted in TransCanada sharing a portion of the anticipated synergies with Columbia's stockholders. It would not have affected whether Columbia's stockholders received fair value.

### c. Claims Of Favoritism During The Pre-Signing Process

In their second attack on the sale process, the petitioners contend that the pre-signing phase "yields no reliable indication of fair value" because Columbia favored TransCanada over opportunities with other buyers. *See* Dkt. 428 at 73–74. It is true that Columbia began to favor TransCanada over time, but that was because a deal with TransCanada offered higher and more certain value than the alternatives.

The *Aruba* decision illustrates how a targeted pre-signing process can evolve to focus on a single bidder without undermining the deal price as an indicator of fair value. There, the initial phase of the sale process involved outreach to five potential strategic partners, and Aruba's banker later contacted a sixth. All declined to bid. During the second phase of the process, Aruba effectively engaged in a single-bidder negotiation with HP, and the petitioners proved that HP knew that it did not face a meaningful threat of competition. *Aruba Trial*, 2018 WL 922139, at *40–41. As the high court made clear on appeal, this fact pattern did not mean that there was insufficient competition, nor did it render the deal price unfair. *See Aruba*, 210 A.3d at 136 ("[W]hen there is an open opportunity for many buyers to buy and only a few bid (or even just one bids), that does

not necessarily mean that there is a failure of competition; it may just mean that the target's value is not sufficiently enticing to buyers to engender a bidding war above the winning price.").

The sale process in this case followed a similar pattern. It is true that Columbia did not treat all bidders identically, but Columbia's actions did not result in an ineffective sale process or unreliable deal price. Rather than favoring TransCanada throughout, Columbia initially expected Dominion to be the logical buyer. After TransCanada's unsolicited outreach to Smith in October 2015, Columbia remained focused on Dominion, believing that it could pay more. *See* PTO ¶ 428. In early November 2015, when Dominion said it could not meet the Board's ask of $28 per share, Lazard recommended broadening the process with private outreach to TransCanada, Berkshire, and Spectra to "put pressure on [Dominion]." JX 503 at 2–3. Goldman agreed and recommended conducting a broader market test only if the private process failed to produce a bid materially greater than $24 per share. *See* JX 505.

The targeted pre-signing process ultimately included Dominion, NextEra, TransCanada, and Berkshire, but not Spectra. The petitioners fault Columbia for not pursuing Spectra, but they failed to prove that more vigorous pursuit "would have produced a better result." *Dell*, 177 A.3d at 28. On November 3, 2015, Spectra's CEO emailed Skaggs to request a meeting or telephone call "in the next couple of weeks to discuss what we may be able to accomplish together." JX 500. The two talked by phone on November 9. During the call, Spectra's CEO "referenced potential strategic opportunities for Columbia and Spectra, but provided no specifics . . . and did not request a follow-up

meeting or conversation." PTO ¶ 438. Skaggs told Spectra to move quickly, because otherwise Columbia would end talks and proceed with an equity offering. Skaggs Tr. 960; *see id.* at 871. After the call, Spectra went "radio silent." Skaggs Tr. 879; *accord* JX 541. On November 17, Skaggs reported to the Board that Spectra's CEO "had again expressed interest in a potential strategic transaction . . . but had only spoken in terms of generic transaction considerations and had not provided a specific, actionable proposal or requested a substantive follow-up." PTO ¶ 456. In a November 25 update to the Board, Skaggs confirmed that "no additional word had been received" from Spectra. *Id.* ¶ 471. Spectra had a "free chance" to pursue Columbia during the pre-signing phase. *DFC*, 172 A.3d at 376. Spectra's failure to act does not undermine the fairness of the deal price.

The petitioners next claim that Columbia gave more information to TransCanada than to others in November 2015. The simple answer is that the bidders requested different levels of information. Berkshire was the most demanding.[31] TransCanada was next, and both TransCanada and Berkshire asked for redacted precedent agreements. Dominion did not receive them because it did not ask.

The petitioners also complain that Skaggs gave TransCanada and Berkshire an informal bid deadline of November 24, 2015, without sharing the deadline with Dominion.

---

[31] Smith Tr. 316; *see* JX 562 (Goldman describing Berkshire's requests as atypically granular for "early [] M&A dialogue"); JX 555 (Berkshire requesting separate operating models for each OpCo subsidiary); JX 550 (detailed Berkshire diligence questionnaire); JX 565 (same); JX 568 (same); JX 551 (responding to Berkshire request about MLP tax structure); JX 554 (same). *See generally* PTO ¶¶ 460–66 (describing Berkshire diligence).

Columbia told all of the parties it contacted to act quickly before Columbia pivoted to an equity offering, so Dominion knew there was time pressure. *See* Skaggs Tr. 960–61. By November 22, because of extensive interactions with TransCanada and Berkshire, Columbia management expected imminent indications of interest from those firms. Dominion "ha[d] been radio silent." JX 569. Sure enough, TransCanada and Berkshire made prompt bids, and Dominion did not. The petitioners cite an email from November 25, 2015 in which Dominion's partner, NextEra, expressed surprise when Columbia called off the sale process to pursue an equity offering, saying that the deadline "was news to us— we were working on it." JX 592. Dominion and NextEra knew they had to move quickly, and had they been more interested, they would have. There is no evidence that an expression of interest from Dominion and NextEra would have been sufficiently competitive and sufficiently actionable to cause Columbia to forego the equity offering and agree to a preemptive transaction at a higher value than the Merger.

The petitioners likewise claim that Columbia unduly favored TransCanada after the equity offering. As it did throughout the process, Columbia pursued the best opportunity. Columbia first focused on Dominion. Because of Dominion's reticence, Columbia next focused on Berkshire and TransCanada. After the equity offering, Berkshire withdrew for good, calling Columbia's business model "fundamentally broken." *See* JX 547. TransCanada, by contrast, called to express continued interest. That call spurred Smith's meeting with TransCanada in January 2016. *See* Smith Tr. 323; *accord id.* at 234.

As with the evidence regarding management conflicts, Smith's one-on-one meeting with Poirier is the most serious evidence of favoritism towards TransCanada. But as noted

in the section on management's incentives, Columbia did not take TransCanada's $24 per share offer, or even its $25.25 offer. Skaggs and the Board forced Columbia to pay $25.50. The results of Columbia's negotiations compare favorably with the facts in *Aruba* and *DFC*. During the meat of the negotiations in *Aruba*, the company focused exclusively on HP, which knew that it was not facing competition. HP had anticipated offering $24 per share and then giving ground. When Aruba's CEO responded with enthusiasm to HP's approach, HP instead made an opening bid of $23.25. Although HP later increased its bid, after adjusting for a corrected share count, HP described the deal price of $24.67 as "the new $24.00." *See Aruba Trial*, 2018 WL 922139, at *39–41. Likewise, in *DFC*, Lone Star was the only bidder that negotiated price with DFC Global, and rather than increasing its bid, Lone Star lowered it twice. *See DFC Trial*, 2016 WL 3753123, at *3–4.

The petitioners make similar arguments about Columbia's decision to grant exclusivity to TransCanada and to treat the exclusivity as effectively remaining in place even after it terminated. As with Smith's meeting with Poirier, the fact that only one bidder bids "does not necessarily mean that there is a failure of competition . . . ." *Aruba*, 210 A.3d at 136. The trial court in *DFC* found that DFC Global had granted Lone Star exclusivity at an inopportune point in the negotiations and that Lone Star had pressured the company with an exploding offer. *See DFC Trial*, 2016 WL 3753123, at *23. But those factors did not undermine the reliability of the deal price given the objective indicia of fairness that were also present in this case. *See DFC*, 172 A.3d at 349–50, 375–76.

As with their arguments about management incentives, the petitioners have mustered evidence that supports their theory of bidder favoritism, but they failed to show

that Columbia favored TransCanada to a degree that left fundamental value on the table. The Board and management believed that TransCanada was the optimal buyer to pursue, which is why they gave TransCanada exclusivity and continued to deal with TransCanada. *See* PTO ¶ 519. Put simply, "[n]othing in the record suggests that increased competition would have produced a better result." *Dell*, 177 A.3d at 28.

### d. The Standstills

The petitioners appear to argue that the standstills distinguish this case from those where the deal price was reliable despite weak interest from potential suitors. They assert that Columbia permitted TransCanada to breach its standstill by reengaging after the equity offering, while at the same time failing to waive the standstills that bound rival bidders. Although the Board ultimately waived the standstills with Dominion, NextEra, and Berkshire in March 2016, the petitioners say it should have done so sooner, claiming that by that point TransCanada had an insurmountable head start towards a transaction.

Each party that engaged with Columbia during fall 2015 entered into an NDA containing a standstill provision substantially in the form of the following:

> In consideration for being furnished with Evaluation Material by [Columbia], each Party (each such Party in such context, the "Standstill Party") agrees that until the date that is eighteen months after the date of this [NDA], unless [Columbia's] board of directors otherwise so specifically requests in writing in advance, the Standstill Party shall not, and shall cause its Representatives not to . . . directly or indirectly,
>
> (A) acquire or offer to acquire, or seek, propose or agree to acquire . . . . beneficial ownership . . . or constructive economic ownership . . . of any securities or material assets of [Columbia], including rights or options to acquire such ownership,
>
> (B) seek or propose to influence, advise, change or control the

64

management, board of directors, governing instruments or policies or affairs of [Columbia], including by means of a solicitation of proxies . . . , contacting any person relating to any of the matters set forth in this [NDA] or seeking to influence, advise or direct the vote of any holder of voting securities of [Columbia] or making a request to amend or waive this provision or any other provision of this Section 3 or of Section 1 or Section 2 or

> (C) make any public disclosure, or take any action that could require the other Party to make any public disclosure, with respect to any of the matters that are the subject of this [NDA]. . . .

JX 526 § 3 (formatting altered); *see* PTO ¶ 455. The standstills prohibited the counterparties from "seek[ing]" to acquire Columbia or influence its management without the Board's prior written invitation.

The petitioners proved at trial that TransCanada breached its standstill several times. The first breach occurred in mid-December 2015, when Poirier called Smith to convey TransCanada's continued interest in acquiring Columbia. The second breach occurred when Poirier and Smith met in January 2016. There are other instances.[32]

---

[32] *E.g.*, JX 746 (Skaggs writing to Board on January 26, 2016: "Consistent with our recent one-on-one conversations about a potential inbound overture, TransCanada's . . . CEO called me on Monday afternoon (1/25) to outline a proposition to acquire CPG.").

Before Poirier and Smith met in January 2016, Poirier assured Smith that he could share due diligence materials without TransCanada breaching the standstill. *See* JX 485 at 2 ("My understanding is that our respective counsels have talked, and that we are ok to proceed with exchanging information. As we destroyed all non public [*sic*] information, in addition to the data room index, would it be possible to receive again the information you previously sent, including the board summaries?"). At trial, Poirier unpersuasively rationalized his overtures to Smith as complying with the standstill because he "wasn't submitting a formal offer for the company." Poirier Tr. 387. Poirier is an experienced investment banker. He should have understood the standstill's scope. When pushed, he cited unspecified legal advice from TransCanada's counsel. *See id.*; *id.* at 454.

The petitioners posit that but for their own standstills, Berkshire, Dominion, or NextEra would have competed with TransCanada in spring 2016, driving up the deal price. But there is no evidence that Dominion or NextEra had any interest in reengaging with Columbia after the equity offering, and Berkshire refused to do so.[33]

In March 2016, Columbia waived the standstills. If Berkshire, Dominion, or NextEra wanted to bid, then they could have done so in the post-signing phase (but they did not). Their failure to do so resembles the fact pattern in *Aruba*, which cited the absence of bidding during a passive post-signing market check as supporting the fairness of the price. *See Aruba*, 210 A.3d at 136 ("[A]fter signing and the announcement of the deal, still no other buyer emerged even though the merger agreement allowed for superior bids.").

---

On January 22, 2016, TransCanada's in-house counsel drafted an email to Columbia's in-house counsel opining that an upcoming call between Girling and Skaggs would not breach the standstill, because although "there may be some broad discussion regarding valuation of [Columbia]," Girling would not make an offer to buy. JX 735. The point of talking numbers was to facilitate a bid, thus breaching the standstill. TransCanada's in-house counsel concluded her email by seeking confirmation that TransCanada would not breach the standstill "in the event [that it made] a verbal or written offer or proposal." *Id.* That request effectively sought waiver of the DADW, also a breach.

[33] The petitioners advance a similar argument about the threat of massive tax liability deterring potential acquirers from buying Columbia. NiSource spun off Columbia in a tax-free transaction, but an acquirer could become liable for the tax if it had negotiated to buy Columbia before the spinoff and then bought it afterwards. *See* I.R.C. § 355(c)(2), (e); Tres. Reg. § 1.355-7(b)(3)(iii); Rev. Rul. 2005-2 C.B. 684. The petitioners cite an April 2016 email in which TransCanada's CFO cited "rumblings, that we are unable to confirm or refute, that Enbridge may have had prior discussions with NiSource that could impact the tax-free status of the spin of Columbia." JX 1108. With the potential exception of TransCanada, there is no direct evidence of anyone negotiating with NiSource before the spinoff. *See, e.g.*, JX 311 (circumstantial evidence of TransCanada and Lazard engaging in talks before spinoff). The petitioner failed to carry their burden of proof on this issue.

The *DFC* decision also involved a passive post-signing market check in which no bidders emerged. *DFC*, 172 A.3d at 359.

The evidence does not show that the standstills undermined the fairness of the deal price. None of the standstill parties wanted to bid, and they in fact did not bid.

### e. Claims About An Information Vacuum

In a variant of their arguments about bidder favoritism, the petitioners contend that Skaggs and Smith misled the Board or otherwise ran the sale process unsupervised. They posit that but for these actions, the Board would have engaged more vigorously with other bidders. If credited, these arguments would show that the Board could have gotten more than fair value, but they would not show that the deal price fell below that mark. *See DFC*, 172 A.3d at 370 (noting that "the purpose of an appraisal is not to make sure that the petitioners get the highest conceivable value that might have been procured had every domino fallen out of the company's way").

On different facts, fraud on the board could lead to a deal price below fair value. In this case, the petitioners' assertions are largely unsupported. The Board received a steady flow of information, with Skaggs regularly keeping the directors informed through written memos, presentations during meetings, and one-on-one communications.[34]

---

[34] By February 2016, Skaggs was updating the Board on an at least weekly basis. *See, e.g.*, JX 780; JX 785; JX 806; JX 808; JX 830; JX 846; JX 852; JX 855. By March, Skaggs was updating the Board on a near-daily basis. *See, e.g.*, JX 874; JX 913; JX 929; JX 939; JX 945; JX 962; JX 964; JX 995; JX 1004; JX 1007; JX 1010.

The petitioners contend that Skaggs misled the Board in November 2015 by failing to report that Spectra asked for a meeting, but Skaggs testified credibly that he regarded Spectra's passes as "casual passes" that "weren't serious." Skaggs Tr. 946. The petitioners also say that Skaggs should have told the Board that he gave TransCanada and Berkshire a bid deadline of November 24, 2015, without sharing the deadline with the other suitors. The better view of the evidence is that Skaggs told all of the interested parties that they had to move quickly before Columbia pivoted to an equity offering in December. TransCanada and Berkshire received more specific guidance because they showed the most interest. The petitioners also assert that Skaggs should have told the Board that not all suitors received the same due diligence in November 2015, but the bidders got what they requested.

As with the petitioners' other challenges to the sale process, their best argument centers on Smith's meeting with Poirier on January 7, 2016. Smith sent Poirier confidential due diligence materials and assured him that TransCanada faced no competition. The Board did not authorize the meeting or the disclosures.[35] And although Skaggs generally was forthcoming with the Board, in this instance Skaggs told the Board that TransCanada had reached out to Smith, without mentioning that Smith met with Poirier and without reporting Smith's unauthorized disclosures. *See* JX 698.

---

[35] *See, e.g.*, Kittrell Tr. 1107–08 ("Q. . . . And it's fair to say that the board never authorized management to tell any potential bidder that Columbia had eliminated the competition for a competing bid. Right? A. The board would never have given that specific direction."); *accord* Kittrell Dep. 164 (describing Smith's strategy as "counterintuitive").

The petitioners have identified a flaw in the process, but they have not shown that it led to a price below fair value. After Poirier's meeting with Smith, TransCanada proposed a price range similar to its indication from before the equity offering. Columbia declined and pushed back.

The petitioners also assert that when the Board met on January 28 and 29, 2016, Skaggs "manipulate[d] the Board into approving a TransCanada bid." Dkt. 428 at 21–22. Skaggs presented a chart discussing what the directors "would have to believe" about Columbia's future trading price to reject a merger proposal at $26 per share, and Skaggs recommended that the Columbia directors accept an offer at $26 unless they believed Columbia would trade at $30.11 in 2017. JX 753 at 9. Goldman prepared the initial version of the chart, and at trial, the petitioners pressed Skaggs on why his version omitted a column which showed that the directors should be indifferent to an offer at $26 per share if they believed Columbia would trade at $27.69 at a 8.5% cost of equity in 2016. *See* Skaggs. Tr. 982–90. In reality, Skaggs' chart was Goldman's summary of the other charts it had prepared. *Compare* JX 753 at 9, *with* JX 726 at 4. The absent column came from a chart that Skaggs did not present. Skaggs did not mislead the Board by presenting the summary chart in its entirety.

Finally, the petitioners fault Skaggs for not telling the Board that on March 12, 2016, Spectra requested due diligence and promised a written offer "in the next few days," or that Goldman thought Spectra was "serious." JX 992. The Board had previously approved a script that required a "serious written proposal" as a condition to diligence. Skaggs prepared for an offer from Spectra by having Goldman get an ability-to-pay analysis ready.

69

*See* JX 1009. Goldman determined that at a price of $25.50, Spectra risked a credit downgrade and dilution until 2019.[36] Spectra never made a written offer.

The petitioners did not prove that the Board was misled or deprived of material information. The petitioners did prove that management at times knew more about the sale process, which is inevitable because directors do not run companies on a day-to-day basis. The record does not show that informational differences led to a deal price below fair value.

### f.    The Stockholder Vote

In an entire fairness case, the unitary entire fairness standard "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). Drawing on an entire fairness case, TransCanada posits that the informed approval of disinterested stockholders, especially by a large margin, "is compelling evidence that the price was fair." *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *29 (Del. Ch. July 21, 2017), *aff'd*, 2018 WL 1905256 (Del. Apr. 23, 2018) (ORDER). The petitioners take the opposite tack and argue that if they can show defects in the stockholder approval process, such as disclosure violations, then that should undermine a claim that the deal price reflects fair value.

It is not self-evident that stockholder approval should have the same implications for an appraisal proceeding as an entire fairness case, given that the former is a statutory

---

[36] *See* JX 1022; JX 1016 at 20; *see also* Mir Tr. 1212 (describing Lazard's view that Spectra was "not a credible or capable buyer").

remedy that turns solely on inadequacy of price, while the latter is a liability proceeding in which the entire fairness test is used to determine whether fiduciaries have breached their duties.[37] The entire fairness test can apply to a wide range of transactions, only some of which require stockholder approval under the Delaware General Corporation Law. A complex body of law governs the extent to which stockholder approval lowers the standard of review from entire fairness to the business judgment rule, shifts who bears the burden of proving fairness, or operates as evidence of fairness under the unitary entire fairness test. *See, e.g.*, *ACP Master*, 2017 WL 3421142, at \*16–19, \*29. When an appraisal proceeding follows a long-form merger like the one in this case, stockholder approval is a statutory prerequisite. *See* 8 *Del. C.* § 251(c). The Merger would not have closed (and appraisal rights would not have been triggered) unless the stockholders approved the transaction. How different levels of stockholder approval should affect the valuation inquiry is something that our cases have yet to work out.

In this case, TransCanada argues that holders of approximately 95.3% of the shares that were present in person or by proxy at Columbia's meeting of stockholders favored the Merger. Under Delaware law, a merger requires the approval of holders of a majority of the outstanding shares, making that the appropriate denominator for consideration. *See* 8

---

[37] *See generally* Charles Korsmo & Minor Myers, *Reforming Modern Appraisal Litigation*, 41 Del. J. Corp. L. 279, 320–25 (2017) (comparing appraisal with fiduciary review with primary focus on deals without a controlling stockholder); Charles Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U. L. Rev. 1551, 1607–09 (2015) (same).

*Del. C.* § 251(c). Under this voting standard, a non-vote counts the same as a "no" vote. In Columbia's case, holders of 73.9% of its shares voted in favor of the Merger, making the rate of approval perhaps not as high as it might appear. Neither side introduced expert testimony or other evidence that would enable the court to assess the degree to which this level of approval reflected an endorsement of the deal price, other than recognizing the obvious fact that a majority of the outstanding shares approved it.

The petitioners argue that the court should not give any weight to stockholder approval in this case because the proxy statement that Columbia distributed to its stockholders was materially misleading. *See* JX 1136 (the "Proxy"). The petitioners cite a list of issues, but three are most significant.

The first concerns an omission and a misleading partial disclosure about Columbia's NDAs. The Proxy disclosed that Columbia had entered into NDAs in November 2015 with Parties B, C, and D, but the Proxy did not disclose that the NDAs contained standstills, much less DADWs. The Proxy then disclosed misleadingly that "[u]nlike TransCanada, none of Party B, Party C or Party D sought to re-engage in discussions with [Columbia] after discussions were terminated in November 2015." *Id.* at 46. The Proxy failed to provide the additional disclosure that all four parties were subject to standstills with DADWs, that TransCanada breached its standstill, and that Columbia opted to ignore TransCanada's breach.

In an effort to blunt these issues, TransCanada points out that the Proxy disclosed that "none of Party A, Party B, Party C or Party D would be subject to standstill obligations that would prohibit them from making an unsolicited proposal to the Board following

72

announcement of entry into the merger agreement with TransCanada." *Id.* at 60. TransCanada cites a secondary source indicating that some 80% of surveyed NDAs contained standstills and 64% contained DADWs, then argues that stockholders should have known that the NDAs contained these restrictions and that Columbia waived them. Stockholders should not have had to guess about whether the NDAs contained these powerful provisions, and while it was true that the restrictions did not apply post-signing, the Proxy created the misleading impression that Parties B, C, and D were not bound by standstills during the pre-signing period.

These problems with the Proxy were material. A reasonable stockholder would have found it significant that TransCanada and Parties B, C, and D were bound by standstills in fall 2015 and that TransCanada was permitted to breach its standstill to pursue the Merger. A leading treatise on mergers and acquisitions identifies benefits to standstills, but also warns of potential dangers.

> [I]t may well be that the presence of [standstill] provisions will cause third parties to put their highest and best prices on the table in any pre-signing market check or auction since, for them, there will be no "tomorrow." However, such provisions, especially if coupled with either a provision that prohibits the target from waiving the prohibition or one which does not permit the third party from requesting [*sic*] a waiver undercuts the effectiveness of the post-signing market check.

Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 4.04[6][b], at 4-92 (2019 ed.) (footnotes omitted). The limitations imposed by the standstills and DADWs made their presence material to Columbia's stockholders.

The petitioners next cite the Proxy's failure to disclose that Skaggs and Smith were planning to retire in 2016. TransCanada disputes the factual claim, arguing that Skaggs was

open to continuing work and observing that the Board wanted Smith to stay on as CFO after the Merger. It was not inevitable that Skaggs or Smith would retire in 2016, but they wanted to and did. *See, e.g.*, JX 1034 (Smith asking advisor immediately after signing: "[D]o you think I can retire now?"). Although this decision has found that Skaggs and Smith's desire to retire did not undermine the sale process, a reasonable stockholder would have regarded their plans as material. *See, e.g.*, *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) ("[A] reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by a board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price, because the procession of a deal was more important to him, given his overall economic interest, than only doing a deal at the right price.").

Finally, the petitioners cite the Proxy's partial disclosure regarding Smith's meeting with Poirier on January 7, 2016. *See* JX 1136 at 46. The Proxy failed to mention that Smith invited a bid and told Poirier that TransCanada did not face competition. TransCanada downplays the meeting as preliminary and immaterial given the generous deal price. Stockholders could decide how much weight to give the information, but the information itself was material.

The petitioners proved that the Proxy contained material misstatements and omissions. In light of the flawed Proxy, this decision does not give any weight to the stockholder vote for purposes of evaluating the reliability of the deal price.

### g. The Deal Protections

The petitioners contend that the deal protection measures in the Merger Agreement undermined the effectiveness of the sale process. Under the Delaware Supreme Court's precedents, the deal protections did not have that effect.

The Merger Agreement contained a no-shop clause with a fiduciary out. As is customary, the Merger Agreement provided broadly that Columbia could not solicit, provide information to, or engage in discussions with any party other than TransCanada, then created an exception identifying circumstances under which Columbia could respond to an interested party. The first half of Section 4.02(a) of the Merger Agreement established the broad prohibition, stating:

> The Company agrees that, except as permitted by this Section 4.02, neither it nor any of its Subsidiaries nor any of the officers and directors of it or its Subsidiaries shall, and it shall instruct and use its reasonable best efforts to cause its and its Subsidiaries' employees, investment bankers, attorneys, accountants and other advisors or representatives (such officers, directors, employees, investment bankers, attorneys, accountants and other advisors or representatives, collectively, "Representatives") not to, directly or indirectly:
>
> (i) initiate, solicit or encourage any, or the making of any, inquiry, indication of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, any Acquisition Proposal;
>
> (ii) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any information or data to any Person relating to, any inquiry, indication of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal; or
>
> (iii) otherwise knowingly facilitate any effort or attempt to make any inquiry, indication of interest, proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal.

JX 1025 § 4.02(a) (the "No-Shop Clause") (formatting altered).

The second half of Section 4.02(a) of the Merger Agreement carved out the exception to the general prohibition. It stated:

> Notwithstanding anything in the foregoing to the contrary, prior to the time the Company Requisite Vote is obtained, the Company may, subject to the Company providing prior notice to Parent,
>
> (A) provide information in response to a request therefor by a Person who has made a bona fide written Acquisition Proposal that did not result from a breach of this Section 4.02 if the Company receives from the Person requesting such information an executed confidentiality agreement on terms not less restrictive to the other party than those contained in the Confidentiality Agreement (it being understood that such confidentiality agreement need not prohibit the making, or amendment, of an Acquisition Proposal but which shall not prohibit the Company from fulfilling its obligations under this Section 4.02); provided, however, that the Company shall promptly after the execution thereof provide a true and complete copy to Parent of any such confidentiality agreement and any such information to the extent not previously provided to Parent, in each case, redacted, if necessary, to remove the identity of the Person making the proposal or offer; or
>
> (B) engage or participate in any discussions or negotiations with any Person who has made such an unsolicited bona fide written Acquisition Proposal, if and only to the extent that,
>
> (x) prior to taking any action described in clause (A) or (B) above, the board of directors of the Company determines in good faith (after consultation with its outside legal counsel) that the failure to take such action would reasonably be expected to result in a breach of the directors' fiduciary duties under applicable Law and
>
> (y) in each such case referred to in clause (A) or (B) above, the board of directors of the Company has determined in good faith based on the information then available and after consultation with its outside legal counsel and its financial advisor that such Acquisition Proposal either constitutes a Superior Proposal or could reasonably be expected to result in a Superior Proposal. . . .

*Id.* § 4.02(a) (the "Superior-Proposal Out") (formatting altered).

Importantly for present purposes, the Superior-Proposal Out permitted Columbia to provide due diligence information in response to "a request therefor by a Person who has made a bona fide written Acquisition Proposal," subject only to the bidder entering into an NDA "on terms not less restrictive to the other party than those contained in" the NDA with TransCanada. It also provided that the NDA did not have to contain a standstill, thereby eschewing the deal lawyer's trick of turning the requirement that the bidder sign an equivalent confidentiality agreement into a powerful backdoor defensive measure. The provision also authorized Columbia to redact the name of the person making written Acquisition Proposal. This aspect of the provision did not require a superior-proposal determination before furnishing due diligence, nor did it impose any delay before Columbia could comply. *Cf. In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523, at *6–8 (Del. Ch. Dec. 9, 2011) (discussing a radically buyer-friendly version of superior-proposal out and possible alternative formulations). The definition of Acquisition Proposal made this aspect of the provision easy to satisfy by defining that term as

> any proposal or offer . . . relating to any transaction or series of transactions involving
>
> (A) any direct or indirect sale, lease, transfer, exchange, acquisition or purchase of any assets or one or more businesses that constitute more than fifteen percent (15%) of the net revenues, net income, or assets of the Company and its Subsidiaries, taken as a whole, or more than fifteen percent (15%) of the total voting power of any class of equity securities of the Company,
>
> (B) any direct or indirect sale, exchange, transfer or other disposition, tender offer or exchange offer or similar transaction that, if consummated, would result in any Person or "group" . . . acquiring beneficial or record ownership of more than fifteen percent (15%) of the total voting power of any class of securities of the Company, or

77

(C) any merger, reorganization, consolidation, share exchange, business combination, recapitalization, liquidation, joint venture, partnership, dissolution or similar transaction involving the Company (or any Subsidiary or Subsidiaries . . . whose business constitutes more than fifteen percent (15%) of the net revenues, net income or consolidated assets of the Company and its Subsidiaries, taken as a whole).

JX 1025 § 4.02(b)(i) (formatting altered).

The Superior-Proposal Out required that before engaging or participating in any discussions or negotiations, Columbia had to made additional determinations. First, the Board had to determine "in good faith (after consultation with its outside legal counsel) that the failure to take such action would reasonably be expected to result in a breach of the directors' fiduciary duties under applicable Law." Second, the Board had to determine that the Acquisition Proposal "either constitutes a Superior Proposal or could reasonably be expected to result in a Superior Proposal," with that term defined as

a bona fide written Acquisition Proposal that did not result from a breach of this Section 4.02 relating to any acquisition or purchase by a Person or group of Persons of

(A) assets that generate more than fifty percent (50%) of the consolidated total revenues of the Company and its Subsidiaries, taken as a whole, (B) assets that constitute more than fifty percent (50%) of the consolidated total assets of the Company and its Subsidiaries, taken as a whole, or (C) more than fifty percent (50%) of the total voting power of the equity securities of the Company,

in each case, that the board of directors of the Company determines in good faith (after consultation with its financial advisor and outside legal counsel)

[1] is reasonably likely to be consummated in accordance with its terms, taking into account

(x) the timing and likelihood of consummation of the proposal (including whether such Acquisition Proposal is contingent on receipt

78

of third party financing or is terminable by the acquiring Person or group upon payment of a termination fee),

> (y) all legal, financial and regulatory aspects of the Acquisition Proposal and

> (z) the Person or group making the Acquisition Proposal (including in respect of the potential effects of any actions that might be required by any Government Antitrust Entity in connection with the consummation of such transaction), and

[2] if consummated, would result in a transaction more favorable to the Company's stockholders from a financial point of view than the Merger.

*Id.* § 4.02(b)(ii) (formatting altered; Arabic numerals added). This dimension of the Superior-Proposal Out contained relatively middle-of-the-road standards for its exercise. *Cf. Compellent*, 2011 WL 6382523, at *6–8.

The Merger Agreement also contained a no-change-of-recommendation provision with its own fiduciary out. As with the structure of the No-Shop Clause and Superior-Proposal Out, the provision first broadly prohibited the Board from taking any action or agreeing to take any action to (i) change its recommendation in favor of the Merger, (ii) recommend any Acquisition Proposal, (iii) cause or permit Columbia to enter into any letter of intent, agreement in principle, acquisition agreement, or merger agreement regarding any Acquisition Proposal, other than a confidentiality agreement as contemplated by the Superior-Proposal Out, or (iv) take any action to exempt an Acquisition Proposal from any takeover statute. JX 1025 § 4.02(c) .The Merger Agreement then provided that if Columbia received a Superior Proposal *and* the Board determined that its fiduciary duties required it, then the Board could change its recommendation or, if it wished, terminate the Merger Agreement for purposes of entering into an agreement with respect to Superior Proposal.

79

Before taking either step, Columbia had to give TransCanada notice that the Board intended to take that action, and TransCanada then would have four business days to match the Superior Proposal. The matching right was unlimited, and any new or revised Superior Proposal triggered an additional matching period of four business days. The pertinent provisions stated:

> Notwithstanding anything to the contrary set forth in [the no-change-of-recommendation provision], prior to the time [that stockholder approval of the Merger] is obtained and so long as the Company is in compliance with [No-Shop Clause]:
>
> > (i) the board of directors of the Company may
> >
> > > (A) effect a Change of Recommendation in response to a Superior Proposal that is not otherwise withdrawn at the time of the Change of Recommendation or
> > >
> > > (B) cause the Company to terminate this Agreement for the purpose of entering into a definitive agreement with respect to a Superior Proposal that is not otherwise withdrawn at the time of such termination (provided that the Company shall have paid the Termination Payment prior to or concurrently with such termination), which definitive agreement the Company shall enter into concurrently with or immediately following such termination,
> > >
> > > in either case, if and only if the board of directors of the Company determines in good faith (after consultation with its financial advisor and outside legal counsel) that the failure to take any such action would be inconsistent with the directors' fiduciary duties under applicable Law; provided, however, that the board of directors of the Company may not take any such action unless
> > >
> > > > (1) the Company first provides written notice to Parent (a "Superior Proposal Notice") advising Parent that the board of directors of the Company intends to either effect a Change of Recommendation or terminate this Agreement pursuant to Section 7.01(c)(i), which notice shall specify the reasons therefor and include the material terms and conditions of the

applicable Superior Proposal and attach a copy of the most current draft of any written agreement relating thereto,

(2) during the four (4) Business Day period following receipt by Parent of the Superior Proposal Notice (the "Superior Proposal Negotiation Period") (it being understood that the first Business Day following the day on which a Superior Proposal Notice is received shall be the first day of the Superior Proposal Negotiation Period), the Company negotiates in good faith with Parent and its Representatives, to the extent requested by Parent, with respect to any revisions to the terms of the transactions contemplated by this Agreement proposed by Parent; provided, however, that if during any Superior Proposal Negotiation Period there shall occur any subsequent amendment to any material term of the applicable Superior Proposal, the Company shall provide a new Superior Proposal Notice and a new Superior Proposal Negotiation Period shall commence (provided that, with respect to any Superior Proposal, each new Superior Proposal Negotiation Period that commences shall be for a period of four (4) days, except that in no event shall any new Superior Proposal Negotiation Period shorten the four (4) Business Day duration of the first Superior Proposal Negotiation Period) and

(3) at or after 5:00 p.m., New York City time, on the last day of the Superior Proposal Negotiation Period, the board of directors of the Company (after consultation with its financial advisor and outside legal counsel) determines that the Superior Proposal would continue to be a Superior Proposal, taking into account any changes to the terms of this Agreement theretofore agreed to by Parent in writing . . . .

*Id.* § 4.02(d)(i) (formatting altered). A separate fiduciary out permitted the Board to change its recommendation in response to an "Intervening Event," defined as "an event, fact, occurrence, development or circumstance that was not known to" the Board "as of the date of this Agreement (or if known, the consequences of which were not known to the board of directors of the Company as of the date of this Agreement) . . . ." *Id.* § 4.02(d)(ii). Unlike

with a Superior Proposal, the Board could not terminate the Merger Agreement in response to an Intervening Event.

If the Board terminated the Merger Agreement in response to a Superior Proposal or if Columbia's stockholders failed to approve the Merger, then Columbia was required to (i) pay TransCanada a $309 million termination fee and (ii) reimburse TransCanada for "authorization, preparation, negotiation, execution and performance" expenses not to exceed $40 million. *Id.* § 7.02(c). Those amounts represented 3.42% of the total equity value of the Merger, which was $10.2 billion. TransCanada believed that a Superior Proposal would "effectively require total consideration greater than $26.27 per share" because the termination fee was equivalent to 77 cents per share, or roughly 3% of $25.50. JX 1093 at 6. The $40 million expense reimbursement would increase the per-share figure by another 10 cents.

Although these provisions created obstacles for competing bidders, they did not undermine the sale process for appraisal purposes. Commentators have perceived that under the Delaware Supreme Court's recent appraisal decisions, a sale process will function as a reliable indicator of fair value if it would pass muster if reviewed under

enhanced scrutiny in a breach of fiduciary duty case.[38] The combination of deal protection

measures would not have supported a claim for breach of fiduciary duty.[39]

---

[38] *Compare* Lawrence A. Hamermesh & Michael L. Wachter, *Finding the Right Balance in Appraisal Litigation: Deal Price, Deal Process, and Synergies*, 73 Bus. Law. 961, 962 (2018) (commending outcomes in *Dell* and *DFC* and arguing that "the Delaware courts' treatment of the use of the deal price to determine fair value does and should mirror the treatment of shareholder class action fiduciary duty litigation"), *and id.* at 982–83 (citing *Dell* and *DFC* and observing, "What we discern from the case law, however, is a tendency to rely on deal price to measure fair value where the transaction would survive enhanced judicial scrutiny . . . . Thus, in order to determine whether to use the deal price to establish fair value, the Delaware courts are engaging in the same sort of scrutiny they would have applied under *Revlon* if the case were one challenging the merger as in breach of the directors' fiduciary duties." (footnote omitted)), *with* Charles Korsmo & Minor Myers, *The Flawed Corporate Finance of* Dell *and* DFC Global, 68 Emory L.J. 221, 269 (2018) (criticizing *Dell* and *DFC* as "conflat[ing] questions of fiduciary duty liability with the valuation questions central to appraisal disputes").

[39] *See, e.g.*, *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *8–10 (Del. Ch. June 30, 2014) (rejecting fiduciary challenge to "(1) a no-solicitation provision; (2) a standstill provision; (3) a change in recommendation provision; (4) information rights for [the acquirer]; and (5) a $5 million termination fee" where termination fee represented 4.5% of equity value and change-of-recommendation provision included unlimited match right); *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *10 (Del. Ch. Jan. 3, 2013) (describing "the no solicitation provision, the matching rights provision, and the termination fee" as "customary and well within the range permitted under Delaware law" and observing that "[t]he mere inclusion of such routine terms does not amount to a breach of fiduciary duty"); *In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *4 & n.47 (Del. Ch. Apr. 11, 2011) (describing "a termination fee plus expense reimbursement of 4.4% of the Proposed Transaction's equity value, a no solicitation clause, a 'no-talk' provision limiting the Board's ability to discuss an alternative transaction with an unsolicited bidder, a matching rights provision, and a force-the-vote requirement" as "standard merger terms" that "do not alone constitute breaches of fiduciary duty" (quoting *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *7 (Del. Ch. Dec. 18, 2009))); *In re Atheros Commc'ns, Inc. S'holder Litig.*, 2011 WL 864928, at *7 n.61 (Del. Ch. Mar. 4, 2011) (same analysis for no-solicitation provision, matching right, and termination fee); *In re 3Com*, 2009 WL 5173804, at *7 & n.37 (also same analysis for no-solicitation provision, matching right, and termination fee (collecting authorities)).

The facts of *Aruba* involved a similar suite of deal protections. The merger agreement in that case "prohibited Aruba from soliciting competing offers and required the Aruba Board to continue to support the merger, subject to a fiduciary out and an out for an unsolicited superior proposal" and included a termination fee equal to 3% of the merger's equity value. *Aruba Trial*, 2018 WL 922139, at \*21, \*38. The matching rights were similar too: HP had "an unlimited match right, with five days to match the first superior proposal and two days to match any subsequent increase, and during the match period Aruba had to negotiate exclusively and in good faith with HP." *Id.* at \*38 (footnote omitted). Viewing the deal protections holistically, the Delaware Supreme Court found that potential buyers had an open chance to bid, which supported the high court's use of a deal-price-less-synergies metric to establish fair value. *See Aruba*, 210 A.3d at 136.

The outcome in *Aruba* comports with guidance from a frequently cited treatise, which identifies "critical aspects" of a merger agreement that does not "preclude or impermissibly impede a post-signing market check." Kling & Nugent, *supra*, § 4.04[6][b], at 4-89 to -90.

> First, the economics of the executed agreement must be such that it does not *unduly* impede the ability of third parties to make competing bids. Types of arrangements that might raise questions in this regard include asset lock-ups, stock lock-ups, no-shops, force-the-vote provisions, and termination fees. The operative word is "unduly;" the impact will vary depending upon the actual type of device involved and its specific terms.
>
> \* \* \*
>
> Second, the target should be permitted to disclose confidential information to any third party who has on its own (i.e., not been solicited) "shown up" in the sense that it has submitted a proposal or, at a minimum, an indication of interest which is, or which the target believes is, reasonably likely to lead to

> (and who is capable of consummating) a higher competing bid. In this regard, the target should also be able to negotiate with such third parties. This removes any informational advantage that the initial (anointed) purchaser may have.

* * *

> Finally, the target board of directors should have the contractual right, without violating the acquisition agreement, to withdraw or modify its recommendation to shareholders with respect to the transaction provided for in the executed acquisition agreement.

*Id.* at 4-90 to -94.1 (footnotes omitted). Using this framework, the deal protections did not preclude or impermissibly impede a post-signing market check. Columbia waived the standstills with Dominion, NextEra, and Berkshire before signing the Merger Agreement, so those provisions did not operate as a constraint during the post-signing period. Any party could obtain due diligence simply by submitting a bona fide written Acquisition Proposal and entering into the required confidentiality agreement; the initial Acquisition Proposal did not itself have to be a Superior Proposal. If the competing bidder then made an Acquisition Proposal that either constituted or could reasonably be expected to result in a Superior Proposal, and if the Board determined that its fiduciary duties required it, then the Board could negotiate with the competing bidder. And if the competing bidder made a Superior Proposal that TransCanada was unable or unwilling to match, then the Board could withdraw or modify its recommendation in support of the Merger Agreement. Going beyond what the treatise describes, Columbia could take the additional step of terminating the Merger Agreement and entering into an agreement regarding the Superior Proposal, subject only to paying a termination fee and expense reimbursement equal to 3.42% of the Merger's equity value.

85

The petitioners try to bolster their argument about the deal protections by contending that the Proxy distorted the informational content of the post-signing phase by creating the false impression that Parties B, C, and D were never subject to standstills, which they say a competing bidder would take into account when deciding whether to intervene. Under this view, if those parties and TransCanada had been conducting due diligence in November 2015, and if only TransCanada renewed its interest later on, then a party considering a competing bid might reasonably believe that TransCanada was paying top dollar because only TransCanada had decided to proceed. Under those circumstances, a potential competing bidder might view Columbia as fully vetted and decline to bid because of the winner's curse.[40] But a potential topping bidder might be more likely to take the risk of competing with TransCanada if it perceived that TransCanada had been able to move forward while standstills blocked its competitors. In that case, the competing bidder might think there was value that had not yet been priced.

This argument presents a variation of the winner's-curse theory that the Delaware Supreme Court rejected in *Dell*. There, the trial court found that Mr. Dell's participation

---

[40] *Cf. In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1015 (Del. Ch. 2005) ("[I]n his scholarly work Subramanian argues that [the] combination of a termination fee and matching rights raises the fears second bidders have of suffering a 'winner's curse.' This is the anxiety that a first bidder will match the initial topping bid, only to refuse to match the next topping gambit, leaving the second bidder having paid more than was economically rational. This fear, Subramanian points out, is further exacerbated by the common circumstance that first bidders often have superior information on the target, and presumably know when to say when. Of course, the other side of this story is that the first bidder has taken the risk, suffered the search and opportunity costs, and done the due diligence required to establish the bidding floor.").

gave the buyout group advantages that competing bidders would struggle to overcome and which therefore would deter bidding. *See Dell Trial*, 2016 WL 3186538, at \*36, \*42–44. The Delaware Supreme Court explained that "the likelihood of a winner's curse can be mitigated through a due diligence process where buyers have access to all necessary information." *Dell*, 177 A.3d at 32. The high court also cited the trial court's observation that strategic buyers "are less subject to the winner's curse because they typically possess industry-specific expertise and have asset-specific valuations that incorporate synergies." *Id.* (internal quotation marks omitted). Finally, the Delaware Supreme Court emphasized the absence of evidence that another party was interested, explaining that "[f]air value entails at minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay." *Id.* at 29.

Similarly in this case, any competing bidder could gain access to due diligence by submitting a bona fide written Acquisition Proposal and entering into a confidential agreement. Moreover, all of the likely bidders were strategic buyers. Most importantly, the petitioners have not shown that anyone would have made a topping bid. Columbia's sale process involved most of the parties that its bankers thought would be interested, including Berkshire, Dominion, and NextEra. *See* JX 499. Each knew that it was subject to a standstill, and each would have believed that others were similarly bound. None wanted to buy Columbia at anything near TransCanada's price. Spectra was never bound by a standstill, yet did not bid. There is no persuasive evidence that any other party wanted to bid. The evidence instead shows that no one wanted to bid. As in *Dell*, the most plausible

87

explanation is that "a topping bid involved a serious risk of overpayment." *Dell*, 177 A.3d at 33. That in turn suggests that the deal price was "already at a level that is fair." *Id.*

The petitioners failed to show that the Proxy distorted bidder behavior during the post-signing phase. More broadly, the petitioners failed to prove that the deal protection measures undermined the validity of the deal price. The better view of the evidence is that if a bidder had been serious, then it would have come forward.

### h. The Sale Process Was Reliable.

TransCanada proved by a preponderance of the evidence that the sale process made the deal price a persuasive indicator of fair value. The sale process was not perfect, and the petitioners highlighted its flaws, but the facts of this case, when viewed as a whole, compare favorably or are on par with the facts in *DFC*, *Dell*, and *Aruba*.

In reaching this conclusion, I recognize the existence of other decisions that have sought to apply the teachings of *DFC* and *Dell,* and which have declined to rely on the deal price as an indicator of fair value.[41] The petitioners have cited similarities between aspects of the sale processes in those cases and aspects of the sale process in this case, arguing that the deal price here was unreliable.

---

[41] *See Blueblade Capital Opportunities LLC v. Norcraft Cos.*, 2018 WL 3602940, at *23–27 (Del. Ch. July 27, 2018); *In re Appraisal of AOL, Inc.*, 2018 WL 1037450, at *8–10 (Del. Ch. Feb. 23, 2018) (subsequent history omitted). After post-trial briefing and argument in this case, this court took a similar approach in *In re Appraisal of Jarden Corporation*, 2019 WL 3244085, at *24–25 (Del. Ch. July 19, 2019).

In this decision, I have attempted to adhere to the principles expressed in *DFC*, *Dell*, and *Aruba* and to take into account how those decisions applied those principles to the facts. Those factual applications have important implications for the outcome here.

I also continue to regard it as important that the Delaware Supreme Court's decisions in *Dell* and *DFC* reversed trial court decisions for failing to give adequate weight to the deal price. In each case, the Delaware Supreme Court regarded the sale process as sufficiently good that the deal price deserved "heavy, if not dispositive, weight." *Dell*, 177 A.3d at 23; *see DFC*, 172 A.3d at 349, 351. The decisions did not address when a sale process would be sufficiently bad that a trial court could give the deal price no weight. The decisions also did not address when a sale process that was not as good would still be good enough for a trial court to give the deal price weight. Technically, the holdings did not delineate when a sale process was sufficiently good that the trial court should give it heavy if not dispositive weight. The Delaware Supreme Court could have believed the sale processes in *DFC* and *Dell* warranted that level of consideration without excluding the possibility that a not-as-good sale process could deserve the same treatment. I thus do not believe that the Delaware Supreme Court's favorable comments regarding the sale processes in *Dell* and *DFC* establish minimum requirements for other sale processes to meet before the deal price can be considered as a persuasive indicator of fair value.

The *Aruba* decision points in the same direction. There, the trial court found the sale process to be sufficiently reliable to use the deal price as a valuation indicator, but declined to give it weight. The Delaware Supreme Court accepted that the sale process was sufficiently reliable and used the deal price as the exclusive basis for its own fair value

determination. As with *Dell* and *DFC*, the *Aruba* decision did not have to address when a sale process was sufficiently bad that a trial court could decline to rely on the deal price.

The sale process in this case had aspects that compare favorably with the processes in *DFC*, *Dell*, and *Aruba*. It also had aspects that differed from the processes in those cases. On balance, TransCanada proved that the deal price is a reliable indicator of fair value.

### 3.    The Synergies Deduction

"[I]t is widely assumed that the sale price in many M&A deals includes a portion of the buyer's expected synergy gains, which is part of the premium the winning buyer must pay to prevail and obtain control." *DFC*, 172 A.3d at 371. "In an arm's-length, synergistic transaction, the deal price generally will exceed fair value because target fiduciaries bargain for a premium that includes . . . a share of the anticipated synergies . . . ." *Olson v. ev3, Inc.*, 2011 WL 704409, at *10 (Del. Ch. Feb. 21, 2011). "[S]ection 262(h) requires that the Court of Chancery discern the going concern value of the company irrespective of the synergies involved in a merger." *M.P.M. Enters.*, 731 A.2d at 797. To derive an estimate of fair value, the court must exclude "any synergies or other value expected from the merger giving rise to the appraisal proceeding itself . . . ." *Golden Telecom Trial*, 993 A.2d at 507. "Of course, estimating synergies and allocating a reasonable portion to the seller certainly involves imprecision, but no more than other valuation methods, like a DCF analysis . . . ." *Aruba*, 210 A.3d at 141.

TransCanada announced a total of $250 million in target annual synergies, with $150 million attributable to cost and revenue synergies and $100 attributable to financing synergies. PTO ¶¶ 555, 632, 642; *see* Marchand Tr. 489–490. The financing synergies

resulted predominantly from TransCanada generating funds at its lower cost of capital, then channeling them through offshore financing structures to generate tax advantages. Marchand Tr. 490.

The petitioners have questioned the financing synergies because they were not labeled "synergies." In a board presentation, TransCanada labeled the cost and revenue saving as "synergies" and the financing benefits as "offshore."[42] The label is not dispositive. *See* Marchand Tr. 518. The Merger created value if it enabled TransCanada to finance Columbia's business plan using its lower cost of capital. To the extent that value is included in the transaction price, it is value arising from the accomplishment or expectation of the Merger that must be deducted under Section 262(h).

TransCanada asked its valuation expert, Mark Zmijewski, to value the synergies. Using a standard DCF methodology, Zmijewski calculated the net present value of the synergies at $4.64 per share. JX 1351 Ex. VI-3. Zmijewski did not use a DCF analysis to value Columbia, and he disagreed with many aspects of the DCF analysis prepared by the petitioners' expert, so there is some irony in Zmijewski using it here. In *Highfields*, this court declined to use a synergies estimate that the respondent's expert prepared using a DCF analysis, in part because the respondent's expert had not used a DCF methodology

---

[42] JX 935 at 12. In the presentation, TransCanada estimated $150 million in financing synergies. TransCanada lowered this estimate to $100 million for purposes of communicating to the markets, viewing the lower number as more realistic and achievable. *See* Marchand Tr. 494–96.

when rendering his other valuation opinions. *See Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 60–61 (Del. Ch. 2007).

The real question is the extent to which the deal price included synergies. TransCanada's CFO testified that the deal price included 100% of the estimated synergies. *See* Marchand Tr. 490–91. Zmijewski tried to support this testimony by analyzing the reaction of TransCanada's stock to the announcement of the Merger. He found that TransCanada's share price dropped, which was consistent with the view that the Merger was a "bad deal for . . . TransCanada" and a "good deal for Columbia." Zmijewski Tr. 1447–48. Zmijewski's analysis operated at the level of the overall deal price; it did not address the more detailed level of the synergy deduction. *See* JX 1350 ¶¶ 63–65.

The contemporaneous evidence does not indicate that TransCanada allocated synergies to Columbia, much less all of the synergies. TransCanada relies on a presentation to its board that references the full value of both the cost and financing synergies and claims it shows that the synergies were fully allocated to Columbia. *See* JX 935 at 12. The page where these figures appear calculates transaction multiples by taking enterprise values for Columbia that were implied by various prices per share, then dividing those multiples by EBITDA metrics, some of which add synergy figures. *See id.* This table does not indicate that the synergies were allocated to Columbia, and the "football field" page in the presentation places the deal price comfortably within TransCanada's DCF valuation of Columbia without synergies. *See id.* at 6. TransCanada also observes that after Columbia rejected its offer of $25.25 per share, Poirier suggested attempting to identify additional synergies that could justify increasing the offer. *See* JX 911 at 1, 4. TransCanada says that

92

if it had not already priced the synergies into its offer, then there would have been no need to search for additional synergies. But the email exchange shows a range of views among TransCanada executives about the amount that TransCanada should be willing to pay. The email does not suggest that TransCanada had topped out its bid with all of the synergies going to Columbia.

Other internal TransCanada documents focus only on cost synergy estimates of $150 million per year. *See* JX 878 at 48; JX 886 at 28. One informative package of materials for the TransCanada board of directors values Columbia at $26.51 per share using a DCF methodology, then values the cost synergies at $1.93 per Columbia share, with a sensitivity range of $1.89 to $2.61 per share. *See* JX 1008 at 54; *accord* JX 1018 at 1, 24, 26. The deal price of $25.50 per share falls comfortably within TransCanada's valuation ranges without any allocation of synergies. *See* JX 1008 at 50; JX 1018 at 22; JX 1365 ¶¶ 91–92. It also appears, as TransCanada argues, that there were many sources for merger-related value creation that justified paying a premium over Columbia's trading price, and the cost, revenue, and financing synergies were simply the easiest to quantify. *See*, *e.g.*, JX 1027 (synergy overview). But the fact that TransCanada perceived synergies does not mean that the deal price included them.[43]

---

[43] The petitioners argue that the alternative is zero, relying on an article from 1987 that Zmijewski cited in his report. *See* JX 9. The authors examined a sample of tender offers from 1963 to 1984 and observed that "[o]nly when competing bids are actually made do we observe greater returns to target shareholders and a dissipation of the initial gains to the stockholders of the bidding firms." *Id.* at 22–23. The petitioners argue that Columbia never solicited competing bids, so Columbia could not have extracted any synergies. The article does not support this claim. It finds that targets extract a share of surplus even in single-

Given this evidence, I am not able to credit TransCanada's position that Columbia received 100% of synergies worth $4.64 per share. TransCanada bore the burden of proving a downward adjustment for synergies. TransCanada did not meet its burden of proof. TransCanada likely could have justified a smaller synergy deduction, but it claimed a larger and unpersuasive one. This decision therefore declines to make any downward adjustment to the deal price.

### 4. Change In Value Between Signing And Closing

Because the valuation date in an appraisal is the date on which the merger closes, fair value must be determined based on the "operative reality" at the effective time. *See Technicolor IV*, 684 A.2d at 298. The deal price provides an indication of the value of the company on the date of signing. It does not necessarily provide an indication of the value of the company on the date of closing. In this case, over three months passed between the signing of the Merger Agreement on March 17, 2016, and the closing of the Merger on July 1, 2016. The petitioners contend that Columbia's value increased during this period. As the party arguing for an upward adjustment to the deal price, the petitioners bore the burden of proof on this issue.

By treating the petitioners as having argued that Columbia's value increased between signing and closing, this decision is giving the petitioners the benefit of the doubt

---

bidder contests, but also finds that only in multi-bidder contests do the returns to bidders dissipate. The article thus supports the view that TransCanada did not share all of its synergies with Columbia. It does not support the view that TransCanada did not share any of its synergies with Columbia.

94

on an argument they did not explicitly make. The petitioners argued that if the court adopted Columbia's unaffected trading price as an indicator of fair value, then it should make an upwards adjustment because Columbia's value would have increased by the time of closing. The petitioners did not make the same argument about the deal price, but the same logic applies. Using either the unaffected trading price or the deal price results in a temporal gap between the valuation indicator and the closing date. In this case, the date for the unaffected trading price was March 9, 2016. The parties signed the Merger Agreement on March 17. The deal closed on July 1. The length of the intervening periods differs by only eight days.

The problem with giving the petitioners the benefit of the doubt on this argument is that they did not suggest a means of adjusting the deal price to reflect the increases in value that resulted from the factors they cite. Perhaps an expert could have constructed a metric, but the petitioners in this case did not provide one. For purposes of adjusting the deal price, the petitioners failed to satisfy their burden of proof.

The petitioners' arguments for an upward adjustment are also unpersuasive in their own right. They contend that Columbia's value increased because the market for CPPL's equity recovered and because commodity prices improved. The petitioners did not provide persuasive evidence on either point.

### a. An Improved Market For CPPL Equity

In their first argument for an upward adjustment, the petitioners contend that Columbia's value increased between signing and closing because the market for CPPL's peers recovered. They proposed using changes in indices of peer companies to translate

those developments into an increased trading price for CPPL. They also cite circumstantial evidence that CPPL's trading price was rising in late February and early March 2016, possibly suggesting an upward trend that would have continued if Columbia had not announced the Merger. *See* Dkt. 390 Ex. D.

The petitioners' theory builds on the fact that after the spinoff, CPPL's trading price declined as part of broader investor dissatisfaction with MLPs. Columbia recognized that it could not use CPPL to raise the growth capital needed for its business plan, so it explored less attractive alternatives like a parent-level equity raise. The petitioners argue that if CPPL's trading price had recovered, then Columbia could have used CPPL to fund its business plan.

As their primary evidence of a price change, the petitioners cite the Alerian MLP Index and the Alerian Natural Gas MLP Index (the "Gas Index"), both of which improved by approximately 17% between signing and closing.[44] CPPL's price did not improve during the same period; it fell. The petitioners address this difficulty by pointing to two analyst reports and to internal emails from a petitioner fund, which suggest that CPPL's trading price dropped after the announcement of the Merger because market participants feared

---

[44] The petitioners also rely on a Wells Fargo research report that mentions that certain MLPs had success raising capital in 2016, but it did not focus on natural gas MLPs. *See* JX 1468. The successful equity raises largely involved blue-chip sponsors, offered preferred units that Columbia could not support because of its debt load, or were completed through at-the-market raises, a technique that could not have sustained Columbia's business plan. *See* Adamson Tr. 1333–40, 1406–09.

that TransCanada would not transfer assets to CPPL to the same degree as Columbia would have on a standalone basis. *See* JX 1069 at 8; JX 1056; JX 1061.

There are several problems with the petitioners' reliance on the indices. The broader Alerian MLP Index is a poor proxy for CPPL. It consists of firms that transport or store energy commodities generally, and it tends to tracks the price of crude oil. *See* Jeffers Tr. 743–44; Jeffers Dep. 75; *see also* JX 740 at 9–10. The Gas Index provides a better proxy, but the petitioners' industry expert testified that the higher prices and lower yields associated with that index resulted from the announcement of the Merger, which restored the market's faith in natural gas MLPs. *See* Goodof Tr. 151. To the extent his testimony accurately captured the reasons for the change, then any increase in value implied by the Gas Index would have resulted from the accomplishment or expectation of the Merger and would need to be excluded under Section 262(h). In actuality, TransCanada demonstrated that the lower yields resulted from changes in the composition of the Gas Index. *See* JX 1470; Goodof Tr. 152–54. TransCanada also demonstrated that the lower yields did not reach the level that Columbia needed to use CPPL to fund its business plan. *See* Adamson Tr. 1338–39. The change in the Gas Index does not persuasively support an increase in Columbia's value.

More broadly, Columbia's inability to raise growth capital through CPPL reflected investors' wider concerns about MLPs. Because of developments in the broader MLP industry, this model of raising capital was fundamentally broken. *See* JX 547; JX 1345 at 72–76. It was particularly broken at Columbia, which faced additional difficulties in raising capital because of its high debt load. *See* Adamson Tr. 1332–37. A three-month uptick in

the two Alerian indices does not prove that Columbia fixed its model and does not support an increase in Columbia's value.

### b. An Improved Market For Commodities

In their second argument, the petitioners cite changes in commodity prices. They point out that after the spinoff, Columbia's trading price dropped as energy stocks fell out of favor because of a decline in commodity prices. They argue that as commodity prices recovered, energy stocks recovered. They point out that between signing and closing, the prices of natural gas and natural gas futures increased by 58.79% and 55.15%, respectively. *See* PTO ¶¶ 685, 690.

One difficulty with this argument is that Columbia's stock price did not recover with commodity prices. It remained stagnant until the Merger leaked on March 9, 2016. *See* Dkt. 390 Ex. A. The bigger difficulty with this argument is something everyone agrees on: Columbia's value does not depend on commodity prices, except at the extremes when ultra-low commodity prices could affect the creditworthiness of Columbia's counterparties. *See* PTO ¶¶ 293–94. The petitioners correctly point out that the declining stock market hurt Columbia in fall 2015, and they say that the mirror-image trend should benefit Columbia on the upside. But in fall 2015, the declining market hurt Columbia because it could not use CPPL to raise equity capital. Columbia then faced the prospect of raising equity capital by issuing its own shares in a declining market, which would dilute Columbia's value and threaten a downward spiral. The problems that Columbia faced from a declining market did not reflect operational problems. They reflected constrained financing alternatives. The commodity-price story does not support an increase in Columbia's value.

## 5. The Conclusion Regarding The Deal Price

TransCanada proved that the deal price is a reliable indicator of fair value. TransCanada failed to prove that the consideration provided in the Merger included synergies of $4.64 per share. The petitioners failed to prove that Columbia's value increased between signing and closing, and they failed to prove how any change in value could be translated into an adjustment to the deal price. The market-tested indicator for the fair value of Columbia is therefore $25.50 per share.

## B. The Unaffected Trading Price

TransCanada contends that the unaffected trading price of Columbia's stock is a strong indicator of Columbia's fair value. The petitioners contend that the court should not give any weight to Columbia's trading price. As the proponent of this valuation metric, TransCanada bore the burden of demonstrating its reliability.

Both sides retained experts who rendered opinions on the persuasiveness of the unaffected trading price as an indicator of fair value. TransCanada relied on Zmijewski, who is an emeritus professor of finance at the University of Chicago and a consultant at Charles River Associates. The petitioners relied on Eric Talley, a professor of law at Columbia University and co-director of the Millstein Center for Global Markets and Corporate Ownership.

The parties debated many issues relating to the unaffected trading price, including (i) whether the trading price could provide insight into fundamental value, (ii) whether the trading price contained an implicit minority discount, (iii) whether investors lacked access to or the trading price otherwise failed to incorporate material information about

99

Columbia's value, and (iv) whether investor sentiment about broader trends in the energy markets artificially depressed Columbia's trading price. This decision could devote many pages to parsing through the competing expert testimony, the parties' evidentiary showings, and their legal arguments.

Ultimately, however, Delaware precedent demonstrates that a reliable trading price is not a prerequisite to a reliable determination of fair value based on a deal-price-less-synergies metric. Consequently, assuming TransCanada failed to prove that the trading price was a reliable indicator of fair value, that ruling would not undermine this court's ability to rely on the deal price. Indeed, even if the petitioners proved affirmatively that the trading price was an *unreliable* indicator of fair value, that finding would not undermine this court's ability to rely on the deal price. On the facts of this case, the deal-price-less-synergies metric is the most reliable approach, making the analysis of the trading price comparatively unimportant.

The Delaware cases that have developed the deal-price-less-synergies metric demonstrate that a reliable trading price is not a prerequisite to a reliable deal-price-based determination of fair value. The *Union Illinois* decision was the first time a Delaware court deployed the deal-price-less-synergies metric,[45] and that decision used it as the exclusive

---

[45] As precedent for the deal-price-less-synergies metric, the *Union Illinois* decision cited three cases: *M.P.M. Enterprises*, *Cooper v. Pabst Brewing Company*, 1993 WL 208763 (Del. Ch. June 8, 1993), and *Van de Walle v. Unimation, Inc.*, 1991 WL 29303 (Del. Ch. Mar. 7, 1991). *See Union Illinois*, 847 A.2d at 343 (citing the three cases and stating that "our case law recognizes that when there is an open opportunity to buy a company, the resulting market price is reliable evidence of fair value").

The *Pabst* decision appears to be the first Delaware case to determine fair value by drawing on the pricing of the deal that gave rise to the appraisal proceeding, but the *Pabst* court did so in a manner that differed from *Union Illinois.* After a public auction involving competitive bidding by multiple suitors, G. Heileman Brewing Company acquired Pabst Brewing Company through a structurally coercive, two-tiered tender offer, in which Heileman paid $32 per share in the first step and squeezed out the remaining stockholders in the back-end merger for a package of subordinated debentures with a face value of $24 per share. *Pabst*, 1993 WL 208763, at *2, *8. The court rejected all of the parties' valuation methods, forcing the court to "make a determination based upon its own analysis." *Id.* at *8. The court reached a fair value conclusion of $27 per share by blending the front-end and back-end consideration to reach a value of $29.50, and then deducting a control premium, which the court estimated "did not exceed $2.50 per share." *Id.* at *8, *10. The court did not equate the control premium with a synergies-based deduction.

After *Pabst*, the concept of a deal price metric next surfaced in *M.P.M. Enterprises.* The petitioners were minority stockholders in privately held company that was sold to a third-party buyer. The trial court valued the company using a DCF analysis. The respondent appealed, asserting that the trial court erred by failing to give weight to the transaction price and relying heavily on *Van de Walle*, a breach of fiduciary duty action in which a controlled company was sold to a third party and all stockholders received consideration having the same value. As one of many reasons for entering judgment in favor of the defendants, the *Van de Walle* court cited the arm's-length negotiations between the seller and the buyer. In an eloquent turn of phrase that has figured prominently in twenty-first century appraisal decisions, the *Van de Walle* court observed that "[t]he fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair." 1991 WL 29303, at *17. In *M.P.M. Enterprises*, however, the Delaware Supreme Court distinguished *Van de Walle* as a breach of fiduciary duty case and observed that "[a] fair merger price in the context of a breach of fiduciary duty claim will not always be a fair value in the context of determining going concern value." 731 A.2d at 797. The high court did express agreement with "the general statement made by the Court in *Van de Walle*" to the effect that "[a] merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value." *Id.* But the high court again cautioned that "in an appraisal action, that merger price must be accompanied by evidence tending to show that it represent the going concern value of the company rather than just the value of the company to one specific buyer." *Id.* Citing the trial court's broad discretion when assessing fair value, the high court in *M.P.M. Enterprises* affirmed the trial court.

basis for valuing a privately held company. *See Union Illinois*, 847 A.2d at 343 ("UFG was not a public company and therefore its shares were not listed for trading on a stock exchange."). The foundational decision for the deal-price-less-synergies metric thus deployed it in the absence of any trading price, much less a reliable trading price. *See id.* at 357, 364 (awarding "the value of the Merger Price net of synergies" after finding that the deal price was "the most reliable evidence of fair value" and "giving 100% weight to that factor").

Three years after *Union Illinois*, the *Highfields* decision was next to deploy the deal-price-less-synergies metric, and the first to use it for a widely held, publicly traded firm. *See Highfields*, 939 A.2d at 61 (giving 75% weight to deal-price-less-synergies metric). The court regarded the trading price as an *unreliable* indicator of fair value, because the "stock price included an element of value reflecting merger speculation leading up to [the merger's] announcement." *Id.* at 58. Even so, the court had no difficulty finding that after deducting synergies, the deal price was a reliable indicator where it "resulted from an arm's-length bargaining process where no structural impediments existed that might prevent a topping bid." *Id.* at 59. The *Highfields* decision shows that the deal-price-less-synergies metric does not require a *reliable* trading price.

After *Highfields*, the deal-price metric lay dormant for six years before returning to prominence in a string of five decisions issued between 2013 and 2015.[46] Each of those

---

[46] *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771 (Del. Ch. Oct. 21, 2015); *LongPath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443 (Del. Ch. June 30, 2015); *Merlin P'rs LP v. AutoInfo, Inc.*, 2015 WL 2069417 (Del. Ch. Apr. 30, 2015);

decisions determined fair value based solely on the deal price, and in finding that the deal price was reliable, each decision focused predominantly on whether the merger resulted from a "proper transactional process."[47] The decisions did not view the reliability of the deal price as turning on the reliability of the trading price. Only one of the decisions considered the reliability of the trading price. In *AutoInfo*, the petitioners argued that the company "was thinly traded and lacked financial analyst coverage[,]" which led to "the market underpric[ing] the company because it was ignorant of its potential." *AutoInfo*, 2015 WL 2069417, at *12. The court rejected this argument as a basis for undermining the deal price as an indicator of fair value, explaining that "the Merger price does not reflect the value that a potentially uniformed market attributed to AutoInfo." *Id.* The court noted that the deal price generated a premium of 22% over the unaffected trading price and concluded that "[w]hile the market may have been uninformed about AutoInfo before the sale process, it subsequently gained ample information" by virtue of the sale process. *Id.*

---

*In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726 (Del. Ch. Jan. 30, 2015); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807 (Del. Ch. Nov. 1, 2013). At the trial level in *Golden Telecom*, this court stated that "an arms-length merger price resulting from an effective market check is entitled to great weight in an appraisal." *Golden Telecom Trial*, 993 A.2d at 507. The trial court in *Golden Telecom* declined to apply the deal-price-less-synergies metric on the facts of the case because two large stockholders holding a combined 44% of the equity stood on both sides of the transaction and a special committee treated the deal as if the company had a controlling stockholder. *Id.* at 508–09.

[47] *Ramtron*, 2015 WL 4540443, at *20; *see BMC*, 2015 WL 6164771, at *14 ("robust, arm's-length sales process"); *Ancestry.com*, 2015 WL 399726, at *16 ("[T]he process here . . . appears to me to represent an auction of the Company that is unlikely to have left significant stockholder value unaccounted for.").

The reliability of the sale process rendered irrelevant the potential unreliability of the trading price.

The decisions that followed *Highfields* and preceded the Delaware Supreme Court's decision in *DFC* thus illustrate a general rule that trading-price reliability is not a prerequisite for deal-price reliability. *DFC* does not suggest a contrary rule. The *DFC* decision cited with approval both *Union Illinois*, where the trial court used the deal price for a privately held company, and multiple post-*Highfields* rulings that had relied on the deal price without regard to the trading price or despite evidence that it was unreliable. *See DFC*, 172 A.3d at 363 n.84.

*Dell* also does not suggest a contrary rule. The Delaware Supreme Court found that both the trading price and the deal price were reliable indicators of value. *See Dell*, 177 A.3d at 5-7, 24-27, 35. The high court did not hold that its finding as to the latter depended on the former. Instead, the *Dell* decision regarded the trial court's treatment of the trading price and the deal price as independent sources of error.

The Delaware Supreme Court's most recent appraisal decision cuts the same way. In *Aruba*, the Delaware Supreme Court held that the trial court erred by relying on the unaffected trading price. The high court indicated that the trading price was unreliable partly because the market had not received information about Aruba's strong earnings. *See Aruba*, 210 A.3d at 138–39. At the same time, the decision accepted the trial court's finding that the deal price was a reliable valuation indicator. *See id.* at 141–42. The Delaware Supreme Court pointed to HP's "access to nonpublic information to supplement its consideration of the public information available to stock market buyers," including that it

"knew about Aruba's strong quarterly earnings before the market did, and likely took that information into account when pricing the deal." *Id.* at 139. The reliability of the deal price thus operated independently of the trading price. Like *DFC*, the *Aruba* decision cited *Union Illinois* and *Highfields* with approval. *See id.* at 135 n.41.

Based on these authorities, this decision does not have to make a finding regarding the reliability of the trading price as a condition to relying on the deal price. It remains conceivable that there could be a case where the parties anchored deal negotiations off the trading price, but this is not that case. All of the bidders, including TransCanada, submitted expressions of interest based on their views of Columbia's value. Although the various parties at times referred to market premiums when discussing bids or potential bids, the bids were not priced at a premium over the trading price. TransCanada's chief concern about the trading price was that Columbia might demand a big premium, creating a risk of overpayment. *See, e.g.*, JX 594 (Poirier remarking that "[if] the stock trades up, [Columbia's] pricing expectations will increase accordingly, and this transaction will be challenging for us.").

As in *Aruba*, TransCanada submitted its formal bids after conducting extensive due diligence and receiving considerable non-public information, including (i) long-term management projections and (ii) the precedent agreements that secured Columbia's growth projects. TransCanada and Columbia then went back and forth over price based on the confidential information that Columbia possessed and TransCanada had obtained. These efforts "improved the parties' ability to estimate" Columbia's "going-concern value over that of the market as a whole." *Aruba*, 210 A.3d at 139.

105

To reiterate, if the petitioners proved that the trading price in this case was an unreliable indicator of fair value, then it would not undermine the reliability of the deal price given the manner in which Columbia proceeded. This decision therefore has not parsed the parties' many arguments about the trading price. I have considered that form of market evidence, and having done so, I regard the deal price as a more reliable indicator of value. Relying on the trading price would only inject error into the fair value determination.

## C.    The Discounted Cash Flow Method

The petitioners contend that the court should determine Columbia's fair value using a DCF analysis prepared by their expert, William Jeffers. He valued Columbia at $32.47 per share. TransCanada did not submit its own DCF analysis. Instead, Zmijewski critiqued Jeffers's model. As the proponent of valuing Columbia based on the work of their expert, the petitioners bore the burden of proving the reliability of his valuation.

The DCF method is a technique that is generally accepted in the financial community. "While the particular assumptions underlying its application may always be challenged in any particular case, the validity of [the DCF] technique *qua* valuation methodology is no longer open to question." *Campbell-Taggart*, 1989 WL 17438, at *8 n.11. It is a "standard" method that "gives life to the finance principle that firms should be valued based on the expected value of their future cash flows, discounted to present value in a manner that accounts for risk." *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005).

> The DCF model entails three basic components: an estimation of net cash flows that the firm will generate and when, over some period; a terminal or residual value equal to the future value, as of the end of the projection period,

106

of the firm's cash flows beyond the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value.

*In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del. Ch. 1991) (internal quotation marks omitted).

In *Dell* and *DFC*, the Delaware Supreme Court cautioned against using the DCF methodology when market-based indicators are available. In *Dell*, the high court explained that "[a]lthough widely considered the best tool for valuing companies when there is no credible market information and no market check, DCF valuations involve many inputs—all subject to disagreement by well-compensated and highly credentialed experts—and even slight differences in these inputs can produce large valuation gaps." *Dell*, 177 A.3d at 37–38. The high court warned that when market evidence is available, "the Court of Chancery should be chary about imposing the hazards that always come when a law-trained judge is forced to make a point estimate of fair value based on widely divergent partisan expert testimony." *Id.* at 35. Making the same point conversely in *DFC*, the Delaware Supreme Court advised that a DCF model *should* be used in appraisal proceedings "when the respondent company was not public or was not sold in an open market check . . . ." *DFC*, 172 A.3d at 369 n.118. The high court commented that "a singular discounted cash flow model is often most helpful when there isn't an observable market price." *Id.* at 370.

This case is not one where a DCF valuation is likely to provide a reliable indication of fair value. Columbia was publicly traded, widely held, and sold in a process that began with pre-signing outreach and finished with an open, albeit passive, post-signing market

check. Jeffers's valuation of $32.47 per share stands in contrast with contemporaneous market evidence.

- Jeffers's valuation is 27% higher than the deal price of $25.50 per share.

- Jeffers's valuation is 64% higher than the unaffected trading price of $19.75 per share.[48]

- Jeffers's opinion that the value of Columbia materially exceeded the deal price conflicts with the market behavior of other potential strategic acquirers who had shown interest in Columbia, and who did not step forward to top TransCanada's price.

*Dell* and *DFC* teach that a trial court should have greater confidence in market indicators and less confidence in a divergent expert determination. *See Dell*, 177 A.3d at 35–38; *DFC*, 172 A.3d at 369–70 & n.118.

Consistent with the Delaware Supreme Court's observations in *Dell* and *DFC*, Jeffers's DCF valuation had many inputs, and Zmijewski questioned a number of them. The proper choices were matters of legitimate debate, and the outcome of those debates generated large swings in the valuation output.

For Columbia, the swings were particularly large because management's business plan (the "0&12 Plan") forecasted major capital expenditures between 2016 and 2021, resulting in projected negative cash flow of nearly $4 billion during that period. *See*

---

[48] For reasons previously discussed, this decision has not relied on the unaffected trading price as a valuation metric and has not made a finding as to whether or not the trading price was reliable. The significant distance between the trading price of $19.75 and expert valuation of $32.47 per share is nevertheless worth observing, because it suggests that at least one of these metrics, and possibly both, is wrong.

Zmijewski Tr. 1457–58. As a result, all of the positive value derived from the terminal period. In Jeffers's calculation, the terminal value represented 125% of his valuation of Columbia. Jeffers Tr. 783–85. Given this fact, small changes in the assumptions and inputs that generated the terminal value, such as the discount rate, growth rate, or base-year free cash flow, had a much larger effect on the valuation of Columbia than they would on a typical valuation. *See* Zmijewski Tr. 1457–58. This court has questioned the utility of a DCF in a case where the terminal value represented 97% of the result, finding that "[t]his back-loading highlights the very real risks" presented by using that methodology and "undermin[ing] the reliability of applying the DCF technique."[49]

For example, Jeffers used a beta derived from a five-year regression of weekly returns. Based on his review of the forward pricing curves for natural gas and crude oil, Zmijewski argued that Jeffers should have used a shorter period. Zmijewski also pointed

---

[49] *Union Illinois*, 847 A.2d at 361; *see In re Appraisal of Solera Hldgs., Inc.*, 2018 WL 3625644, at *32 (Del. Ch. July 30, 2018) (discounting petitioners' DCF analysis in part because "nearly *88%* of the petitioners' enterprise valuation is attributable to periods *after* the five year Hybrid Case Projections"). In *Union Illinois* and *Solera*, as in this case, growth rates drove the back-loading of the valuation. In other decisions, when valuators used an exit multiple to derive the terminal value, this court has criticized valuations where a high percentage of value resulted from the terminal period because "the entire exercise amounts to little more than a special case of the comparable companies approach." *Gray v. Cytokine Pharmasciences, Inc.*, 2002 WL 853549, at *9 (Del. Ch. Apr. 25, 2002) (criticizing a valuation on this basis where the terminal value accounted for over 75% of the total value); *see Gholl*, 2004 WL 2847865, at *13 (criticizing discounted cash flow valuation where exit multiples method for calculating terminal year value resulted in the terminal value representing over 70% of its total present value); *Prescott Gp. Small Cap. v. Coleman Co., Inc.*, 2004 WL 2059515, at *24-25 (Del. Ch. Sept. 8, 2004) (same criticism of terminal value derived using exit multiple method that comprised 70% to 80% of present value).

out that Columbia's financial advisors both used betas derived from two-year regressions of weekly observations, and TransCanada's financial advisor used a beta derived from a one-year regression of daily observations. Using a two-year regression of weekly returns would lower the output of the Jeffers DCF model to $18.10 per share. *See* Zmijewski Tr, 1463–67; JX 1368 ¶ 94.

In another example, Jeffers separately valued Columbia's three sources of cash flow: its operating income, its distributions from its limited partner interest in CPPL, and its distributions from its general partner interest in CPPL. But Zmijewski pointed out that Jeffers treated all three as if they were subject to identical risks, thereby underestimating the cost of capital for the limited partner and general partner interests. Correcting Jeffers's discount rates for these cash flows would lower his valuation to a range of $18.96 to $19.23 per share. *See* Zmijewski Tr. 1458–60; JX 1368 ¶ 108.

A final example involves the terminal value calculation. Jeffers used a perpetuity growth rate of 3%. The Proxy indicates that Lazard's DCF analysis implied perpetuity growth rates from 1.4% to 1.9%, and that Goldman's was 1% to 2%. *See* JX 1136 at 65, 75. Reducing Jeffers's terminal growth rate to 1.5% would lower his valuation to $17.28 per share. *See* JX 1368 Ex. V-2.

The wide swings in output that result from legitimate debate over reasonable inputs undermine the reliability of Jeffers's DCF model. And the experts' debates went further, with Zmijewski raising significant questions about the reliability of the Jeffers model's core input (Columbia's management projections). Although the preparation of the 0&12 Plan started with a bottoms-up process, senior management added a "growth wedge" or

"initiative layer" to meet top-down targets. Zmijewski Tr. 1454–56; *see also* JX 491. These add-ons assumed significant returns on unidentified projects that lacked customers or regulatory approval. *See* Adamson Tr. 1317–18; Skaggs Tr. 881–82; Mayo Dep. 273. This too raised fundamental questions about the reliability of Jeffers's DCF analysis as a whole.

If this were a case where a reliable market-based metric was not available, then the court might have to call the balls and strikes of the valuation inputs. In this case, the DCF technique "is necessarily a second-best method to derive value." *Union Illinois*, 847 A.2d at 359. This decision therefore does not use it. *See Solera*, 2018 WL 3625644, at *32.

## III. CONCLUSION

The fair value of Columbia's common stock at the effective date was $25.50 per share. The legal rate of interest, compounded quarterly, shall accrue on the appraised value from the effective date until the date of payment. The parties shall cooperate on a form of final order. If there are additional issues for the court to resolve before entering a final order, then the parties shall submit a joint letter within fourteen days that identifies them and proposes a path to conclude this case at the trial level.